Cowen, Circuit Judge.
The defendants, Southwick, Cannon, and Warren, claim that, in legal effect, the assignment carried to them, not only an interest in the judgment to the amount of the instalment, but a corresponding interest in the mortgaged premises themselves.
This view of the case is strenuously resisted by the complainants; and, although the general rule is admitted, that a direct and unqualified assignment of the whole mortgage debt carries the entire mortgage interest in the *789 iand, it is contended that the assignment in question is not within the rule.
In the first place, it is said the assignment is of a judgment for the debt; of a thing collateral; and not of the debt itself, or any part of it.
The assignment is of the judgment for the instalment $549 83, “ with full power to take all necessary proceedings for *its recovery.” This undoubtedly cut off the right of the complainants to collect that sum, either on the mortgage, bond, or judgment; and the mortgagors, after notice, became, both in equity and at law, debtors pro tanto to the assignees. Both may object to the complainants’ enforcing either of their remedies for anything more than the residue. The assignors then parted with all their interest in, arid control over the debt, to the assignees. The former have nothing left as to the $549 83, either in the bond, mortgage, or judgment. The assignment of a judgment necessarily carries the debt; nolis it possible to separate them. The judgment would be barren, nor can we conceive of its existence without the debt. I must, therefore, hold the debt to be directly assigned in this case ; and all the effects must follow which the law attaches to an assignment of that character. One of these is,' that an interest in the mortgaged premises passes as an incident to. the debt which is the principal. [1] (Jackson v. Blodget, 5 Cowen, 202, 206, and the cases there cited.) True, and this is made another ground for taking the assignment out of the general rule; here is not a transfer of the whole debt due upon the mortgage; • but only a small part of it. That would be a valid objection against its carrying the whole mortgage interest; but it by no 'means follows that the whole interest must remain behind. It is the well settled doctrine, that a mortgage is a mere incidental security for the debt, like a judgment or *790 bond. Foreclosing the mortgage is one of the remedies for default of payment; and all incidental securities, all remedies for a debt, follow it, and reside with the creditors to the extent of their several claims, whether of the whole debt or a part; and must be subject to their control so far as those securities or remedies may be necessary to the collection of the debt. If it be conceded, and it has not, and cannot be properly denied, that a single debt may in equity be parceled out among several, it follows that each must share in the remedies and securities. When you admit that choses in action are an article of traffic, you must allow the creditor not only to sell or mortgage the whole, but also any part, and transfer the part to be holden in severalty or in common; and you must vest in the assignee a Corresponding control over all the incidental means of collection. Suppose the whole of this mortgage debt had been assigned to Southwick, Cannon, and Warren, except the first instalment, which had been left in the complainants, it appears to me the situation of the parties would have been exactly reversed in all respects. Indeed, according to the argument on the side of the complainants, this mortgage has become perfectly nugatory. Both Pattison and Vails and the Weeds are but partial assignees of undivided shares; and if, for want of totality, no interest can pass in the mortgage, they have no rights here as complainants. There are objections as strong against the express assignment of a portion of mortgaged premises, as against an implied assignment. The only objection against either must be the difficulty of ascertaining the aliquot proportion of each. If this is to prevail, there is then no mortgage interest left, except the contingent residuary one of Parsons, the mortgagee. That is certainly as available to Southwick, Cannon, and Warren, as to the complainants.
There is nothing, then, on the face of this assignment, to avoid the usual consequence. The debt passed ; and with it a part of the mortgaged premises, bearing the same proportion to the whole as the instalment bears to the entire mortgage debt.
*791 But it is insisted that, although such may be the legal effect of the assignment, it is súbject to be contradicted by showing the real intention of the parties, which may be done by parol, or other evidence extrinsic the paper itself; and that there is testimony of that character sufficient in this case to establish an intention that the mortgage should be wholly reversed to the complainants.
There can be no doubt that it was competent for the parties to separate the debt from the mortgage; that is, to put the asignees upon the judgment alone for their security, leaving to the assignors their entire interest in the land. In Green v. Hart, (1 John. Rep. 580, 591,) this power of separation was recognized by Spencer, J. In that case, the note of Johnston had been endorsed by Green to Hart; and a mortgage to Green by Johnston’s trustee for securing the note was ^delivered by the endorser to the endorsee. This, it was held, carried the interest in the mortgage, which was an incident of the debt; unless a different intention was established, the burthen of showing which lay with the endorser. The admission that such an intention might be shown, is now relied on by the counsel for the complainants as letting in the parol proof to establish it here. The concession of the learned judge does not discriminate as to the kind of evidence; nor was his attention called to that point. The difficulty there, rested in the proof which had been received not being clear and full. There is little doubt, however, that oral evidence would have been admissible in that case. The assignment itself was mainly oral. The only written evidence, was the endorsement of the note and a receipt, either of which may be varied by parol evidence, even as between the parties. Parol evidence is always admissible to show the particular purpose for which an endorsement is made. It may be shown that the parties never intended to pass any beneficial interest; but merely to create an agency. The whole transaction was then, in effect, a mere oral bargain and sale of the assignor’s interest, which, of course, might be qualified, explained, or contradicted in whole or in part, by evidence of the same degree. But the principal case is *792 widely different. Here the assignment of the debt is in the-more solemn form of a deed. Various conversations were held between the solicitor of the assignors and some of the mortgagors on the one hand, and Cannon, who transacted the business for the assignees, on the other. These conversations related to the consideration of the assignment being advanced by the assignees as a payment of the first instalment, so far as the mortgage was concerned, leaving the assignees to their remedy on the judgment alone. The effect of such an arrangement, properly made, would have been to pay so much quoad the mortgage. All these conversations were, however, some time previous to the execution of the assignment. At that time nothing was said, though had the assignment been also by parol, it would still be open to the remark, that it was, in fair intendment, but a consummation of the terms to be gathered from the prior negotiations. Take the same effect *then as if those terms had been reiterated at the execution of the assignment. There is no position better settled, than that all negotiations prior to, or cotemporaneous with an agreement under seal, are merged in it. A deed comprehends and passes the incident as well as the principal, though the latter only be mentioned. The legal effect of the instrument is the same in respect to both. The form in which such an effect is produced, in the one case by express words and the other by implication, does not take from the conclusiveness of the effect. A deed of land omits to mention emblements ; yet they pass as effectually, and a parol reservation of them is as completely nugatory as if they had been named in the deed. (Austin v. Sawyer, May term, S. C. 1828. M. S. (a) . [1] You cannot, at law, avoid the legal consequence, except by a clause in the deed itself, or a simultaneous paper which is taken as entering into, and forming a part of the deed. The same rule prevails in equity. [2] It was decided, on a bill filed by the assignees *793 of an equity of redemption, seeking directly to vary the terms of a mortgage by setting up an oral stipulation on the part of the mortgagee, “ That parol evidence is inadmissible to contradict or substantially vary the legal import of a-written agreement.” (Stevens v. Cooper, 1 John. Ch. Rep. 425.) In that case, it was insisted at the bar that the mortgage was of a mere personal nature, and incident to the debt; and therefore, the subject of sale without writing, the same as any personal chattel. The answer given was, that the evidence offered was not only denied by the statute of frauds, but was contrary to the maxims of the common law. The following cases also go directly to the same point: Lord Irnham v. Child, 1 Bro. C. C. 92; Lord Portmore v. Morris, 2 id. 219 ; Meres v. Ansell, 3 Wils. 275, 6; Meads v. Lansingh, 1 Hopk. 124. Moses v. Murgatroyd, (1 John. Ch. Rep. 119, 128,) is relied on by the complainants. There an assignment under seal absolute on the face of it, of certain goods, was intended to be in trust for securing debts. On a bill filed by the creditors against the administrator of the assignee, charging that the assignment was in trust to secure their debts, the administrator answered that the assignment was for the general indemnity •of his intestate against advances made by him for the assignor. Parol proof was received, after this admission that the deed was false on its face, to show the real trust. This case must have gone on the ground" mentioned by Chancellor Kent at p. 128, that there was mistake, ignorance or accident in framing the deed; otherwise the case is anomalous, and a departure from settled principles, which cannot be imputed to the learned chancellor who decided it. The correction of an instrument on any of the grounds mentioned by him, is a distinct head of equitable power, never exercised but on a bill filed praying the correction directly, or what is equivalent, where the parties consent to go into the inquiry. The mistake, or other ground of correction, must be charged in the bill, so that it may be answered, and an issue taken upon it. The deed will then, if the evidence warrant it, be reformed and set right by the decree. (1 Bro. C. C. 93, 4. 2 id. 219.) But you cannot do this eol *794 laterally. It cannot be done without allegata et probata upon the" very point.
From, this view of the case it must be taken, as between ■ the complainants and the defendants Southwick, Cannon and Warren, that the first instalment is still due.
But how is it in respect to the other defendants, the mortgagors, and the numerous judgment creditors against whom this bill has been taken pro confesso ? The bill ■ alleges a part payment of the mortgage, which all the defendants, except Southwick, Cannon and Warren, have regarded as correct, and make no defence. It is most unjust, therefore, in respect to them, that these premises should be charged with the first instalment. They may all have an interest. At any rate some of them have. The parties litigating might as well insist on selling for double the original mortgage. In respect to themselves merely; they might do so for aught the other defendants would care. Suppose these defaulting defendants had been put to sleep by an admission on the part of the complainants, that the whole mortgage had been paid except 10 dollars: could it be swelled as against them to its original amount at the instance of their co-defendants ? I suggested this difficulty on the argument; it was not satisfactorily ^answered then ; and it still seems to me utterly insurmountable. It struck me then, and I think so still, that Southwick, Cannon and Warren should either have joined as complainants, or made themselves so by a cross bill. When they saw that their own share was treated by the forclosing parties as paid, they might, by a cross bill, have become complainants, bringing in all the other parties, and giving them a chance to contest the relief now sought in the answer. ' This is the uniform, and, I apprehend, the only course where a defendant is entitled to some positive relief beyond what the scope of the'complainant’s suit will afford him. Both the original complainant, and all the co-defendants, may be called to answer the cross bill, and must be where this is necessary to the protection of their rights. (Coop. Eq. PI. 85.)
But both parties litigant say go on and sell; and however embarrassed the cause may be, they have a right to say so, *795 as to all except the first instalment." This is a matter entirely between Pattison and Tails on one side, and South-wick, Cannon and Warren on the other; and seems more properly a subject of settlement after the master’s report shall come in. I shall, therefore, suspend all directions as between them till that time. The decree of sale will of course not be made till the report shall be confirmed. Such is the settled practice of the court. (Gardiner v. Gamiss, 1 Hopk. 306.)
I shall want the amount due on the first instalment separately ; the amount due on the mortgage beside that instalment ; and the aggregate of both ; each of the three sums to be set down separately. (2 Pow. on Mort. 969, 970.)
I will then say whether the complainants shall be charged as trustees of Southwick, Cannon and Warren, to the extent of the instalment, if the premises sell for so much, or whether the latter shall come in and have their instalment taken as a part of the amount for which the premises are to be sold; and in such an event, whether they shall be preferred, or take pro rata with the complainants.
Order of reference, accordingly ;. and to state amount of incumbrances. All further directions reserved till report.
*At the January term of the court, 1829, the master’s report came in, stating that the 1st instalment with interest amounted to $ 581 05 Due complainants, besides 1st instalment 3756 77 Aggregate • $4337 82
He also reported numerous judgments of large amounts, obtained against Hull and Hopper, two of the mortgagors, after the execution of the mortgage.
The master farther stated specially, that after a first hearing before him in respect to the account upon the mortgage, the complainants discovered new proof, which they supposed went to show a payment or discharge of the first instalment; and the master being satisfied that the discovery was made after the first hearing, he din on the day fixed by him to settle the draft of his report, and before the draft was settled, receive the new evidence which he *796 reported specially. - It consisted of exhibits showing the following state of facts:
Hull and Hopper, two of the mortgagors, with Epaphrus Hull and John Thomas as sureties, on the 25th of October, 1826, executed their joint and several promissory note to Harvey, for $8000. Harvey endorsed this note to South-wick, Cannon and Warren, the defendants litigant. On the 27th of December, 1827, Hull and Hopper, with Epaphrus Hull and one Gibb, executed their joint and several note directly to Southwick, Cannon and Warren for $2525 76. These notes were given by Hull and Hopper as collateral security to Southwick, Cannon and Warren, to protect them against various advances made by-them for Hull and Hopper both before and after the dates of the notes. Southwick, Cannon and Warren also- held various other collateral securities against the same advances, viz., the bond and warrant of Hull and. Hopper to confess judgment on the first mentioned note; and in February, 1827, Hull and Hopper also gave Southwick, Cannon and Warren a power to sell certain boats and vessels of Hull and Hopper, before assigned to Southwick, Cannon and Warren as collateral security, giving Hull and Hopper credit for the proceeds.
*Epaphrus Hull, the surety, who resided in the state of Vermont, died; and according to the law of that state Southwick, Cannon and Warren were cited to appear before the court of probate of the district of Chittenden, by a cer- ■ tain time, to' establish their claim against his estate. They appeared accordingly, and declared on the notes as due from that estate; and the cause proceeded to a decision ; but not being satisfied with the decision of the judge of probate, they appealed to the county court of Chittenden county. This appeal was made on the 7th of March, 1828. That court referred the cause, to three referees, before whom one Eldridge, the administrator of Epaphrus Hull, as respondent, and Southwick, Cannon and Warren, as appellants, were heard upon the question whether the notes were due.
On the hearing before the referees, Southwick, Cannon *797 and Warren, in order to show that the notes were due, brought forward a full statement of all accounts between them and Hull and Hopper. One account against Hull and Hopper, amounted in the aggregate to $7797 25, ranging through various items, from November 15th, 1826, to August 21st, 1828. In this account were included two judgments, the interest in which Southwick, Cannon and Warren claimed as assignees. One of these judgments was under date of February 21st, 1827, and was in favor of one Hart, against Hull and Hopper, of $228 79; and the other was under date of June 20th, 1827, in favor of Parsons against Hull and Hopper, for $562 -68, (being the same judgment now in dispute.) Other items of the account were notes; some dated before and some after the first judgment; but all previous to thp judgment in question. After the date of the judgment in question, followed various charges of disbursements by Southwick, Cannon and Warren for Hull and Hopper, by way of draft and otherwise. Interest was cast on most of the items including the judgments ; and the whole footed at $7797 25.
Then followed a credit of cash receipts from the season of 1827, on sales of lumber, &c., down to a later date, but what date precisely did not appear, of $8118 47.
*These were the first results from the cast of the referees as the account stood allowed by them; which left, on specific debts and credits, a balance of $321 22 against Southwick, Cannon and Warren.
Besides the charges in the above account, the referees found that Southwick, Cannon and Warren were in advance to Hull and Hopper, to the amount of the two notes of Epaphrus Hull, which were therefore due without any deduction except the balance of $321 22, which they at first deducted. But on review they reversed the balance on the specific account, by charging on the debit side a mistake of $540. This being added, left a balance the other way, against Hull and Hopper, of $218 78. They then reported the whole of the two notes to be due, subject to be reduced in favor of the estate of Epaphrus Hull, which *798 stood as a mere surety, by future proceeds from the other collateral securities.
They reported that the estate of Epaphrus Hull was insolvent; and able to pay but 10s. on the pound. This report was afterwards confirmed by the court of common pleas.
The master reported against these proceedings being evidence of a payment or discharge of the first instalment, or any part of it. He stated that he considered the proceeding in Vermont as at the instance of the administrator, to ascertain whether any part of the.two notes had been paid ; not as a proceeding directly between Southwick, Cannon and Warren and Hull and Hopper ; and so not binding on the former.
His opinion was that Southwick, Cannon and Warren might still elect to apply the credits in the report to any part of their debits; and yet hold on to their various collateral securities, till all their claims were satisfied. He, therefore, reported that the first instalment and the judgment therefore, were still due and unsatisfied.
The defendants, Southwick Cannon and Warren, now moved to suppress or set aside all that part of the report which related to the proceedings in Vermont, as irregular, because the master had no power to grant a re-hearing On the other hand, the complainants excepted to the report, on the ground that the first instalment was discharged, or at least partly so.
*Both the objection and the exception were now heard together by consent.
Marsh, for the complainants.
Swetland, for the defendants, Southwick, Cannon and Warren.
Co wen,
Circuit Judge. The complainants except to the result Of the master’s report, insisting that the first instal *799 ment is paid; or if not fully discharged, that no more is due than the balance of th'e account, in which it is included, as struck by the referees, viz. $218 78.
The defendants, Southwick, Cannon and Warren, resist this exception, 1, On the ground that the evidence relied on was not regularly before the master, he having no right to grant the second hearing; but 2. If otherwise, then Southwick, Cannon and Warren are not concluded by the credits in the report of the referees ; and may hold them aloof, to be applied in the best manner for themselves, after seeing how their various collateral securities turn out.
Before going into the merits, I must inquire whether the master regularly received the proofs. If not, they cannot be acted upon here; and the report must be taken as conclusive that the whole mortgage money is due.
The question is whether a master, on a reference to him to take and state an account, may, after the hearing is closed,
.and on the day fixed by him to settle the draft of his report, but before the draft is settled, receive further evidence, he being satisfied that it was discovered after the first hearing.
It is said in Mr. Hoffman’s book (p. 69,) that no further evidence can be taken, on attendance to peruse or to hear report; but the master can only hear the parties as to the propriety of his conclusions from former evidence.
The order of proceeding, as I understand it, after the hearing closed before the master, is to investigate the matters in proof before him, and draft his report; a summons then goes, signed by the master, at the instance of either party, “to peruse *report,” or “hear report.” The object of this is, that the parties may examine the draft, taking copies if they please; and in the language of Mr. Hoffman, suggest particulars in which they think the master may have erred in his results. For the present they are to stop here. The next step is a summons “ to settle the draft reportthe return of which brings us to the stage, at which the master in this case received the further testimony. Mr. Hoffman’s book is relied on at. the page cited, as showing that further testimony cannot be received after the hearing is closed. But he says no such thing, *800 unless it be made out by inference from Ms denying- further proof when the parties come to hear or peruse the report. He denies it then, as I understand him, not as too late, but as being inconsistent with the object of the summons. The parties are then to look, and see if any inadvertent defect is yet to be supplied by testimony. And accordingly Mr. Hoffman immediately after cites Turner who says, that “in attending the warrants (summonses) to .settle the draft, the respective solicitors must state to the master such alterations as in their judgment they may think expedient, and if any evidence has been omitted, it must be brought forward in strictness, before the report is settled.” The very book cited against it, thus makes the production of further evidence almost a matter of course. The attendance to peruse or hear, and attendance to settle, are different stages, and intended for different purposes, as will be seen by the books. They all agree, or, at least, strongly imply, that evidence may be received at any proper and convenient time before the court is finally settled. (2 Mad. Ch. 507, Am. ed. of 1822. 1 Newl. Ch. 341. Blake’s Ch. 230.) The books cited, all go on Thompson v. Lamb, (7 Ves. 587,) and Fearon v. Dawes, or rather Fearon v. Stephenson, (Note (2) of Beame’s Orders, 260.) I should infer from these cases, that a further examination after the hearing, is, in England, pretty much a matter of course, at any proper time before the report is finally settled. Our own practice, though more strict, *will clearly warrant all that has been done here.(a) In Remsen v. Remsen, (2 John. Ch. Rep. 502,) the chancellor says, when ar examination before a master is concluded, “ it ought not t< be opened for further proof, without special and very satis factory cause shown.” In the case before me, the causo was most special and most satisfactory. It was a total ignorance in the party, of the evidence proposed to be adduced, till after the ordinary examination had closed. J have no hesitation in saying, that if the discovery had not *801 preceded the final settlement of the draft, I would open the report, and send the matter down to the master for a re-hearing. This is done in England, even where the error in the report is owing to the party omitting material evidence within his power. True, that is on terms ; as giving up the deposit, which must there be made with the register upon taking exceptions to the report. (Hedges v. Cardinal, 2 Atk. 408.) But the case cited, strongly implies, that "if the testimony was out of his power, or which is the same thing, his knowledge, the order to re-hear would be on terms much less rigorous. The master has, indeed, here done no more than he would have been directed to do, on application, had he refused.
The testimony reported is accordingly received.
2. On looking over that testimony, it will be perceived that the question arising upon it, is the much litigated one of the application of payments made to a creditor who holds a list of demands against his debtor, which demands differ in their rank, and in their penal consequences to the debtor.
I agree with the counsel for the defendants, that the proceedings in Vermont, not being directly between Southwiclc, Cannon and Warren, and their debtors, Hull and Hopper, and the latter not standing in the relation of privies to that proceeding, it is not such a judicial proceeding between the parties as would work a technical estoppel, even were the debtors now before the court insisting on such an effect. Much less can it be relied ón in that view by the complainants, who were utter strangers to that proceeding. It could neither be pleaded nor given in evidence, as an estoppel, in bar to an action on account, or any part of it. Nor does the view which I have finally felt myself constrained to adopt, *require that I should consider the part which Sotithwick, Cannon and Warren took" in those proceedings as an act in pais amounting to an application of the various payments to the specific account. This was the ground taken by the counsel for the complainants ; and there is certainly much argument in ite favor. Southwick, Cannon and Warren urged two ac *802 counts before the referees in Vermont; one was a genera.' or round estimate ; at least appears to be so here, for the items are not given. It equalled the notes, and they were claimed on the foot of that general estimate, as a collateral security by these defendants, and were maintained by the referees as such, and declared to be entirely unpaid. The other account was specific, being set forth item by item, and included the judgment for the instalment in question. The whole accounts amounted, say (for the sake of round numbers) to $19,000. On this account $8000 were received; and were to be credited. The debtors had not directed the application when they made the payment; and I will take the rule at present, as broadly as it was contended for by the complainants’ counsel; that the creditors might make the appropriation of the payments at any indefinite period of time. They did present them as credits by the side of the specific account. They were so placed upon the report of the referees, which Southwick, Cannon and Warren accepted, and procured to be confirmed. They (S. C. & W.) did not, as I have supposed they might have done, make a general appropriation to the whole amount of $19,000, but they adopt a report, apparently making it on a specific part of that account, very nearly corresponding in amount with the credits, and doubtless so intended by them. They do not keep these credits away from the judgments ; but make the latter a part of the specific account. On the ground now taken they had the power to declare what part of their whole account was due; and they elected the general account as due ; and, having done so, the specific account must stand paid as far as the credits will go. The money paid must stand credited to something; and they surely do not want their collateral securities to protect what is actually paid. That is extinguished. They could not, if desirable to them, *keep the moneys received in payment floating about, to sink at their will, upon the most commodious part of their account, in reference of the final avails of their collateral securities, or the nature of their different debts. In this view, $218,78 of the specific account would *803 Still remain due: and giving the defendants their indefinite latitude of application, they might now so apply the credits to that account as to leave so much of the instalment m question due and unpaid; that is to say, they might now apply the payments to other parts of the specific account, withdrawing the judgment in question as to the undischarged balance. • Giving the defendants that ground, therefore, they might still claim the'$218,79.
But this is perhaps not the true ground upon which to dispose of the case. It is true, as the defendants’ counsel insists, that they were called into the court of probates to maintain their notes ; and they did this by showing a balance of general account equal to the notes. It is the fairest construction they can ask *, and I am disposed to give it to them. We then allowAheir whole account, as far as the law will permit, to stand. That account, as far as can be gathered from the reported testimony, consists of the two judgments of about $800; and several promissory notes and matters properly chargeable in account, amounting, we have supposed, to $19,000. About $8000 have been paid upon general account. Neither the debtors, when they made their payments, directed, nor have the creditors made any specific appropriation ; and they refuse to make it, up to this moment. They claim to use the payments as a kind of deposit in their hands, to make up for the ultimate failure of their pending collateral securities. If the mortgage fails to pay the judgment, they may then be under the necessity of applying part of the $8000 to that debt, and keeping it away from other items of claim which are otherwise secured. If the mortgage shall pay the judgment, all the $8000 go to other parts of the account, and so on. They thus insist on holding in their hands a shifting payment, a kind of corps de reserve, to be ordered, up to the weakest point as the occasion shall demand. I am strongly inclined to think the creditors do not possess this power; but that where they neglect *an appropriation, the law will step in and appropriate the payment for them; though, I confess, I have come to this conclusion with some diffidence , and the more so, inasmuch as the learned counsel did not *804 i go so fully into this branch of the subject as its materiality - and importance appear tb me to have demanded. The point was mentioned at the bar 4 bjut no authorities were cited -either way.
•It is certainly well settled, as a general rule, that if a mían owes another two debts, upon two distinct causes, and pays him a sum of money, he, (the payer.) has a right to say to which account the money so paid shall be appropriated (Bois v. Cranfield, Styles, 239; Anon. Cro. Eliz. 68 Pinnel’s case, 5 Rep. 117; and almost every ease which I shall hereafter cite ■;) provided he declares, at the time of payment, the purpose for which it is made. But if-he does not the payee may direct how it shall be applied. (Manning v. Weston, 2 Vern. 606. Anon., 8 Mod. 236. Bowes v. Lucas, Andr. 55. Goddard v. Cox, 2 Str. 1194. Mann v. Marsh, 2 Cain. Rep. 99; and many of the cases which I shall hereafter cite. And vid. Simson v. Ingham, 2 B. & C. 65.)
In Peters v. Anderson, (5 Taunt. 596,) it was held that the creditor might appropriate at a future day,-and,-it seems, at the time of bringing his action, and that he -is not tied down -to "make the -appropriation immediately, like the debtor. The same doctrine is sanctioned -by Goddard v. Cox, (2 Str. 1194,) Wilkinson v. Sterne, (9 Mod. 427,) and -by -the ruling of Thompson, baron, in Newmarch v. Clay, (14 East, 239.)
In "GlaytOn’s case, a subdivision of that of -Devaynes v. Noble, (1 Men 606,) -Sir William Grant, -master of the rolls, considers these cases as invading the rule of the civil law. That rule" is, that where no application was made either by the debtor or creditor -at the time, the law will make the application upon -the presumed intention of the debtor. He -thinks we borrowed the -rule from the civil •law which we have extended much beyond its original meaning. On the other hand, he admits there -are cases utterly irreconcilable with this indefinite right of election in the creditor, -and which come back to the -rule of the civil law. Among -these *he ranks Meggot v. Mills, (1 Ld. Raym. 287,) and Dawe v. Holdsworth, (Peak. N. P. Cas. *805 64.) The right of the creditor to elect ex post facto was denied in both these cases ; and he considers the cases, on the whole, as setting up two conflicting rules. He confesses himself embarrassed, and waives further inquiry into the rule, thinking the case before him was not touched by it. That was the case of a running banker’s account. Clayton had made deposits with, and drawn checks in the usual way, on Devaynes and others, who were partners in the banking business. Devaynes died when there was a balance due Clayton of £1713. Immediately after Devaynes’ death, Clayton, without any additional deposits, drew for and received £1260 of the survivors, leaving £453 still due from the old firm. Afterwards he paid to, and drew considerable sums from the surviving partners, who pursued the former business. His drafts on them were much beyond the balance of £453. The surviving partners becoming insolvent, a bill was filed to charge Devaynes with the whole £1713 as still due, though it was much over drawn, if the payment of checks after Devaynes’ death was to be applied to his debt. The decision went finally on the whole being a blended banker’s account both before and after Devaynes’ death, and upon the course of business and understanding of the parties in respect to such accounts ; wherein the oldest deposit is always met by the oldest draft. And the master of the rolls said the very form of keeping the account by a banker is a sufficient appropriation. The whole debt of Devaynes was therefore holden to be discharged. (Bodenham v. Purchas, 2 B. & A. 45, S. P.) Thus it would seem at this day to be unsettled in England, whether the creditor, on the debtor’s default, can make the appropriation, in all cases, at any time after the payment; whether he must not, at least in certain cases, do it presently. The master of the rolls felt a difficulty in pronouncing whether the rule of the civil law was to be followed, or taken with its extension in favor of the creditor. He truly remarks, that in Meggot v. Mills Lord Holt adopted the reasoning of the civil law, and Dawe v. Holdsworth went upon that case. Peters v. Anderson, the court thought these two cases proceeded on the pre *806 sumed intention of the debtor *to impute the payment to the particular debt of the two upon which he could be made a bankrupt, so as to avoid that criminal or inconvenient consequence. But this does not get rid of the civil law rule, which in the absence of a present appropriation by either party, adopts the presumed intention of the debtor, and makes an application most beneficial to him. There is no adjudication in this state to govern me. The doctrine is glanced at by the present learned chief justice in Baker v. Stackpoole, in giving the opinion of the court of errors (Dec. 1827, M. S.;) (b) but he follows Sir William Grant, passes it by, and rests the case in hand on other principles; the debt to which the creditor was there struggling to apply the payment, had not accrued when the payment was made.
How then stands the real weight of English authority on this question ? How much of the civil law doctrine is left to us ? I am inclined to think that where one owes two debts to another, upon the face of which it must be altogether indifferent to the débtor how the money shall be applied, there a general payment may be applied by the creditor, at any time, to which debt he pleases. (Bosanquet v. Wray, 6 Taunt. 597.) Such was the case of Peters v. Anderson. There the defendant was indebted on a covenant to pay wages, and on a subsequent simple contract to pay wages, to the same creditor. Several general payments were made, and the creditor was allowed to appropriate them to each debt as he pleased. (Goddard v. Cox, 2 Str. 1194. Bloss v. Cutting, cited 2 Str. 1194, 5, S. P. Nemarch v. Clay, 14 East, 239, S. P. Plomer v. Long, 1 Stark. 153, S. P.) On the face of the matter, in Peters v. Anderson, it was at the time equal to the defendant, whether he paid on the first or the last contract. Beyond this, I think the weight of authority is in favor of the civil law rule, although it must be admitted that it is impossible to reconcile the cases. Manning v. Westerne, (A. D. 1707,) is directly against that law. The defendant owed the plaintiff ah old demand without interest, and a younger carrying *807 interest; and the plaintiff was allowed to apply a general payment *to the first; or rather the court so applied it. (Rathby’s Vern. 607, note (1,) giving the decree from the register’s book.) So in the anonymous case (8 Mod. 236, A. D. 1724,) the plaintiff was allowed to apply an indefinite payment to his account, instead of his judgment against the defendant. Bowes v. Lucas, (Andr. 55, A. D. 1737,) is perhaps the same way, though more doubtful. 'The defendant, as administrator, owing rent which had accrued, both before and after his intestate’s death, on a lease to his intestate, the administrator being in possession, made a general payment to the lessor, and would have applied it to the last rent; but the landlord was allowed to apply it to the first.
Now the civil law rule would, as I before remarked, have made an application most beneficial to the debtor. “ The payment (says Sir William Grant, in Clayton’s case, 1 Mer. 606,) was consequently applied to the most burthensome debt; to one "that carried interest, rather than to that which carried none; to one secured by penalty, rather than that which rested on simple stipulation, and if the debts were equal, then to that which had been first contracted.” “ In his qua prasenti die debentur, constat, quotiens indistincte quid solvitur, in graviorem causam videri solutum, si autem nulla pragravit; id est, si omnia nomina similia fuerint, in antiquiorem.” (Dig. L. 46, t. 3. Qu. 5.) The original rule, with all its various illustrations, may be seen in 1 Ev. Poth. 368 to 376, the whole of art. 7; Rules for the application or imputation of payments.
I have given such English cases as I could find which forbid me to apply the doctrine of the civil law to the principal case. I‘feel confirmed that there are none beside, by the failure of the counsel for Clayton, in Devaynes v. Noble, to find any others which could be plausibly turned against that doctrine.
Cases the other way are more numerous; and they range themselves, in the order of time, on both sides of those cited against the rule. In Prowse v. Worthing, (2 Brownl. 107, 8, A. D. 1611,) it is said, “ If debt be due by obliga *808 tion, and another debt be due by the same, debtor to the1 same debtee of equal sum, and the debtor pay one sum gen erally, this shall' be intended payment upon the obligation,’' In Heyward *v. Lomax, (1 Vern. 24, A. D. 1681,) a mar owed one money on a mortgage and also on account Held that a general payment should go on the mortgage “ because it is natural to suppose that a man would rathei elect to pay off the money for which interest is to be paid, than the money due on account, for which no interest is payable,” In Chase v. Box, (2 Freem. 261, A. D. 1702,) it was said by the lord keeper, in analogy to the familiar rule, that a payment goes first to reduce the interest, that where a man owes another on bond carrying interest, and also book account, a general payment shall be applied first to pay the book debt. “ But this was denied at the bar, because when a man payeth money, it shall be applied as he intends that pays it; and therefore where both -parties are silent,-it shall be intended in discharge of that which is most beneficial to him that pays it; and that shall be to sink the debt that carries interest; and said there were precedents for it,” The report says it was held by the lord keeper; but the principal case appears to have been on the single question, now so well settled, whether money paid on a debt shall go first to .the principal or interest. The remark on the two different debts, so very anomalous, I rather choose to consider a mere dictum, thrown out by the lord keeper, -but immediately corrected at the bar, and the correction probably acquiesced in, for the time, by the judge. The earlier case of Meggot v. Mills, (1 Ld. Raym. 286, A. D. 1697,) has been already mentioned. Holt, Ch. J. there says, “ If A., being a trader, becomes indebted to B., in £100, and then he quits his trade, and afterwards becomes indebted to B., in £100 more, and afterwards A. pays to B, £100, not expressing upon what account; since so much in quantity is paid to B., as was due to him from A., when A. was capable of being a bankrupt, it would be too rigorous to admit B. to sue a commission of bankrupts for the old debt of £100.” He said he would not give an absolute opinion; but what he said was not questioned by the other *809 judges of the K. B. who all sat with him. This is evidently the same case with that reported as anonymous in Cumberbach, 463, who speaks of the point as ruled by Holt, Ch. J., without any reserve made. In Dawe v. Holdsworth, *(Peak. N. P. C. 64, A. D. 1791,) before Lord Kenyon, it appeared that one Pittard was a trader in 1785, and became indebted to a creditor in £200. There were afterwards other dealings between them, Pittard again becoming indebted to his creditor in more than £200, and paying him money generally to more than that amount; but not enough to discharge both claims, the balance due on both being still £200, and upwards. Lord Kenyon placed the payments to the old debt first. In an anonymous case, (12 Mod. 559, A. D. 1707, in B. R..) it was held that if one owes £40 by bond, for the payment of £20 at such a day, and £20 by contract to the same person, payable at the same day ; and at the day he pays £20, without telling for which it is, it shall be a payment in equity upon the bond, because that is the most penal upon him.
Now, before we look into the reports of this country, it is worthy of remark, that not only is the rule itself, as to the relative power of debtor and creditor in the application of payments, clearly brought over from the civil law; but the whole list of cases just cited, exhibit the most distinct features of, and, as far as they go, travel pari passu with the corollaries of that law in respect to the applying of indefinite payments. This will be seen at once by looking into the head before quoted from Evans’ Pothier. In Gwinn v. Whittaker’s Admr. (1 Harris & John. Mar. Rep. 754, 5, A. D. 1805,) Chase, Ch. J., treats the doctrine of these cases as the settled law; and does not take pains to cite a single authority in its support. He says, generally that he considers the following principle as established by the judgments of the courts of Maryland, and in harmony with the English decisions : “ If the debtor is indebted on mortgage and simple contract, or on bond and simple contract, and when he makes a payment, should neglect to apply it, the law will make application of it in the way most beneficial to the debtor, that is to the mortgage or *810 bond.” In Dorsey v. Gassaway, (2 Har. & John. 402, 411, 412, A. D. 1809,) the same point as between a mortgage and a subsequent open account, was' directly settled by the general court,-and affirmed on appeal.
*In The United States v. January, (7 Cranch, 572,) Same v. Kirkpatrick, (9 Wheat. 720,) and Cremer v. Higginson, (1 Mason, 323,) the two first cases in the supreme court of the United States, and the last in the first circuit of the United States, the respective powers of thé debtor and creditor in the application of payments are recognised as they are settled both by the civil and the common law. These cases bear no immediate relation to the one I am considering; but The United States v. Kirkpatrick, is important as limiting the power of the parties to malee the application, to some point of time before the controversy has arisen, or at least before the trial. Mr. Justice Story, who delivered the opinion of the court, observes, that if both parties omit the application, the law will make it according to its own notions of justice. The only illustration called for (and in this the court concurred) was, that in cases like the one then before them, of long and running accounts, where debits and credits are perpetually occurring, and no balances are otherwise adjusted than for the mere purpose of making rests, payments should be applied to extinguish debts according to priority of time; so that the credits are to be deemed payments pro tantooi the debts antecedently due. In this the learned judge fell into the civic law rule. (1 Ev. Poth. 374.) I have been thus particular in noticing this case, because I think it not precisely in harmony with a previous case in the same court; that of Field v. Holland, (6 Cranch, 8, 14, 27,) so far as the latter relates to the application of payments. There were a judgment and other demands; and the court held that equity might apply general payments so as to extinguish the other demands first, inasmuch as they were not so well secured; and it was proper to consult the advantage of the creditor, not the debtor. This was done accordingly. The case is directly at antipodes with the civil law; and The United States v. Kirkpatrick is no further inconsistent with it, than as adopting *811 a principle of that law which goes upon priority of time rather than the advantage of the debtor. In neither of these cases do the books appear to have been consulted. There is no English case, that I have been able to find, which prefers the advantage of the creditor in an application , *by act of law, unless it be the solitary one of Manning v. Westerne, before noticed; but, as I have shown, again and again overruled. The anonymous case in 8 Mod. 236, was an .application by the creditor; and I am persuaded that had the attention of the learned chief justice, who delivered the opinion of the court in Field v. Holland, been drawn to the great preponderance of authority the other way, his conclusion would have been the same with that of the court in Maryland.
At an early stage of this investigation, I felt it difficult to resist that conclusion, upon the English cases; though, as I before remarked, I could not be perfectly confident; and my diffidence was increased by seeing such men as Sir William Grant and Ch. J. Savage, with most of those cases before them, start from the question as one profoundly vexed, and avoid an opinion until it should become absolutely necessary to express one. But I feel my conclusion so much fortified by the repeated and solemn decisions of the courts in Maryland, that I can no longer hesitate how to apply the payments by Hull and Hopper, to their creditors, South wick, Cannon and Warren.
We have seen that in virtue of the assignment of the first instalment by Pattison and Vails, to Southwick, Cannon and Warren, Hull and Hopper became both judgment and mortgage debtors, pro tanto, to the assignees. These debtors owing the same creditors other large sums of money on various accounts, but mostly on simple contract, make general indefinite payments to their creditors amounting to many thousand dollars beyond the judgment and mortgage debt; and I infer from the evidence, that they received more than sufficient to satisfy this debt, after they had taken the assignment. The creditors say they never have made any appropriation of the money paid. It must, as I suggested before, be applied somewhere; and cannot be holden *812 as a deposit; (Hammersley v Knowlys, 2 Esp. Rep. 666, 7, per Lord Kenyon;) and the law will apply enough of it at once to extinguish the judgment and mortgage debt for ever. It will do. this within the principle of the civil lafv and the English cases;. that such an appropriation is more beneficial to the debtors than *an appropriation of it on the other demands of inferior consequence to the debtors, though such other demands are large enough to exhaust the whole of the payments, and leave the particular debt yet due. That debt not only ties up the lands of Hull and Hopper by both a general and specific lien; but execution may go upon it against their goods or bodies. Hayward v, Lomax and the two cases decided in Maryland are directly in point. In this view, the decree must be in favor of the complainants, whether there has been an application of payments to the specific account before the referees in Vermont, or not; because, though applied by the creditors to the specific account, the law will select, and, as between the items of that account, extinguish the judgment and mortgage debt, first.
I, therefore, hold the-first instalment satisfied; and the. exception to the master’s report is allowed. (b)
*813 The question on which this case has turned is a vexed one, and I do not think I shall give costs either w'ay. (Staines *v. Morris, 1 Yes. & Bea. 8.) But that point may stand reserved till the coming in of the corrected report.
*814 July term, 1829
The corrected report now coming in,
Marsh, for the complainants, moved for an order of foreclosure and sale, with costs. •
Swetland contra.
Í). Gardner, in reply.
The argument' was confined to the question of costs.
*815 *Cowen,
C. Judge. My impression was so strong that costs ought not to be given either way, that perhaps I ought to have told the counsel so, and prevented a formal argument upon the question. As this cause stood when it was first moved, my inclination was with the defendants *816 (S. C. & W.) throughout. I could not bring myself to doubt that they were assignees of the mortgage as well as of the debt; that they combined the character both of mortgage and judgment creditors. What relief I should have given them, I cannot say : hut had the cause preserved the shape it -then held, some relief must have been extended adverse to the interest of the complainants» Admit that this might have been without costs, .on account of the question having been fairly litigated by the complainants ; the •cause then goes into the master’s office for an account. There a constructive payment *of all the defendants’ claim is set up ; the master disallows it on the point of law; it comes here by exception ■; and after a good deal -of investigation, I draw a different conclusion; and allow the exception. This is on a point, too, .about which English and American chancellors and judges have differed -or -doubted. I found two cases directly contradictory in the same book (Vernon) within a few years of each other. The allowance ■of costs is a matter of discretion ; and in .applying that dis cretion, I felt that I could net escape the-case-of Staines v Morris, which I. referred to at the close of my-opinion upon the exception, and then pointed out to the complainant’s counsel. 'Supposing that the costs were large, and forming *817 perhaps now the heaviest item *of controversy in the cause, I suffered the argument to proceed. The whole merits have been gone over by counsel, to see whether the parties have been fairly litigating, and so com e within the principle of the case cited. The lord chancellor there said, “where there is a fair case for consideration it is not the course to visit the party who fails with costs.” And after adverting to the facts, that he had differed from the master; and that the judges would hot decide the case without the opinion of the court of chancery, and that professional men had differed upon the question, he concludes, “ It would be too presumptuous in me to set such a value upon my own opinion, as to mark the resistance of the defendant with costs.”
*Much has been said about the Unconscientious character of this defence as grounded upon the legal effect of the assignment; that it was contrary to the real understanding of the parties, and that sound morals will not justify it. All this is said upon the parol evidence, which I felt bound to lay out of view in considering the merits ; and I cannot take it up on disposing of the question of costs. On reading that evidence, I am free to confess, I was afraid that all this expensive litigation had grown out of a mere slip of the pen; but even in respect to that question, much can be and much was said on both sides. A jury might have honestly decided either way upon it.
The course of the court is uniform, where the question raised is a fair one, and difficult for the parties to settle themselves, not to give costs against the unsuccessful party. (Anon., 3 Atk. 235. Nourse v. Finch, 1 Ves. jun. 362. Perry v. Whitehead, 6 Ves. 554. White v. Foljambe, 11 Ves. 337. Vancouver v. Bliss, id. 458. Staines v. Morris, 1 Ves. & Bea. 8. Hampson v. Brandwood, 1 Mad. Rep. 381, O’Donel v. Browne, 1 Ball & Be. 264.)
Costs are denied as between these parties.
Decree accordingly.

 4 Kent † 194. Johnson v. Hart, 3 Johns. Cas. 322. 1 John. 580, S. C. Jackson v. Willard, 4 id. 41. Renyan v. Messereau, 11 id. 534. Jackson v. Davis, 18 id. 7. Jackson v. Brown, 19 id. 325. Wilson v. Troup, 2 Cow. 195. Hatch v. White, 2 Gall. 155. Dick v. Mawry, 9 Smeed & M. 448.

 Since reported, ante, 39.

 See 4 Kent, 468.

 See 2 Cowen & Hill’s notes to Phil. Ev. 621, et seq. where all tin leading American authorities are collected.

 By the 109th of the present rules, the next step after hearing closed, is, to issue the master’s warrant for settling the draft of his report; and no previous summons to see the draft and take copies is necessary.

 Since reported, ante, 420.

 On the head of the appropriation, or as continental writers would say the imputation of payments, it is matter of curiosity as well as instruction, to see, how nearly English judges have followed the Roman lawyers, without acknowledging it. As it cannot be supposed they did so unwittingly, we must probably set down their silence to that- inveterate hatred by which their nation.has long been characterized, towards the civil law. A little more liberality on this head, a simple reference to the ground on which the early decisions were founded, would doubtless have prevented, that singular discrepancy which their eases exhibit. Numerous and ancient as those oases are, the digest was not cited by either counsel or court till the decisions of Devaynes v. Noble, (July, 1816.) The master of the rolls is, in that case, left to infer the origin of our rule from the striking similarity between the text of the civil and common law. When the English courts, in default of the parties, have been left to apply the payments, they have, (says Evans in his commentary on Pothier,) “ in several cases directed an application, from the circumstances of the case, nearly correspondent with the rules in the text.” (Pothier’s text commenting on the civil law.) Vid. Ev. Poth. 369, note (a).
A moment’s recurrence to the civil law will convince the learned reader how much wc have borrowed from it almost without credit. The whole text ef that law, in relation to the subject under consideration, is contained pas *813 svm, in the Digest, (Lib. 46, tit. 3, Le sohuiotubus et Hberationifocs;) as is rendered into English by Straham from the French of Domat’s civ. L. in its natural order, as follows :
“ 1. If a debtor who owes to a creditor different debts, hath a mind to pay one of them, he is at liberty to acquit whichsoever of them he pleases; and the creditor cannot refuse to receive payment of it; for there is not any one of them Which the debtor may not acquit, although he pay nothing of all the other debts, provided he acquit entirely the debt which he offers to pay.”
This is precisely the common law : Owing two debts to the same person, you may pay which you please, but you must tender the whole debt. The creditor is not bound to take part of it, though he may do so if he choose. (22 Ed. 4. 252. Br. Condition, pl. 181. Lofft’s Gilb. 330. Pinnel’s case, 5 Co. 117. Colt v. Netterville, 2 P. Wm’s. 304. Anon. Cro. Eliz. 68.) Hawkshaw v. Rawlings, (1 Str. 23,) that the debtor shall not apply the money, is not law. There are 15 or 20 cases the other way.
“ 2. If, in the same case of a debtor who owes several debts to one and the same creditor, the said debtor makes a payment to him, without declaring at the same time which of the debts he has a mind to discharge, whether it be that he gives him a sum of money indefinetely in part payment of what he owes him, or that there be a compensation [i.c. a set-off] of debts agreed on between the debtor and creditor, or in some other manner, the debtor will have always the same liberty of applying the payment to whichsoever of the "debts he has a mind to acquit. But if the creditor "were to apply the payment, he could apply it only-to thatidebt which he himself would discharge in the first place, in case he were the debtor, for equity requires that he should act in the affair of his debtor, as he would do in his own. And if for example, in the case of two debts, one of them were controverted and the other clear, the creditor could not apply the payment to the debt which is contested by the debtor.”
-The right of the debtor to apply the payment, whether total or partial, if he do so at the same time, is recognized by all the cases. As the above doctrine restraining the creditor to an application most favourable to the rights of the debtor, one cannot read the case of Goddard v. Cox, (2 Str. 1194,) without being struck with the similarity both in principle and illustration. The defendant owed the plaintiff three debts, one he contracted himself, a second he owed absolutely in right of his wife, and the third was due from his wife as executrix. The defendant made several indefinite payments, after which his creditor sued him. Chief Justice Lee held the hold of the above civil law doctrine: 1. It was agreed the defendant had first right tu apply the payments; 2. The chief justice held, there being no direction by him, that thereby the right devolved to the plaintiff. And the defendant Being by the marriage equally a debtor for what his wife received dum sola, *814 as for what was after, the plaintiff might apply the money received to discharge the wife’s own debt. “ Rut as to the demand against her as executrix, the validity of which depended on the question of assets, and manner of administering them; he was of opinion the plaintiff could not apply any of the money paid by the defendant to the discharge of that demand.”
“ 3. In all cases where a debtor, owing several debts to one and the same creditor, is found to have made several payments, of which the application has not "been made by the mutual consent of the parties and where it is necessary that it be regulated either by a court of justice, or by arbitrators, the payments ought to be applied to the debts which lie heaviest on the deb. torj'and which it concerns him most to discharge. (12 Mod. 559. 2 Brownl. 107, 8. 1 Vern. 24. 2 Freem. 261. 1 Ld. Raym. 286. 1 Comb. 463. Peak. N. P. Cas. 64.) Thus a payment is applied rather to a debt of whiph the non-payment would expose the debtor to some penalty, and to cost and damages, (12 Mod. 559, 2 Brownl. 107, 8, 1 Vern. 24, 2 Freem. 261, 1 Ld. Raym. 286, 1 Comb. 463, Peake. N. P. Cas. 64, 1 Har. & John. 754, 2 id. 402, 8 Mod, 236,) or in the payment in which his honor might be concerned, than to a debt of which the non-payment would not be attended with such consequences. Thus a payment is applied to the discharge of a debt for which a surety is bound, rather than to acquit what the debtor is singly bound for without giving any security; (Mayrratts v. White, 2 Stark. Rep. 101; Plomer v. Long, 1 id. 153, contra;) or to the discharge of what he owes in his own name, rather then what he stands engaged for as surety for another. Thus a payment is applied to a debt for which the debtor has given pawns and mortgages, rather than to a debt due by a simple bond or promise: (1 Vern. 24: 1 Har. & John. 754; 2 id. 402;) rather to a debt of which the term is already come, than the one that is not yet due, (Hammersly v. Knowlys, 2 Esp. Rep. 666: Niagara Bank v. Roosevelt, per Woodworth, J., ante, 412; Baker v. Stackpoole, per Savage, Ch. J., ante, 436.) or to an old debt before a new one : (1 Meriv. 608:) and rather to a debt that is clear and liquid, than to one that is in dispute, (Goddard v. Cox, 2 Str. 1194,) or to a pure and simple debt before one that is conditional, (id. and ante, 412.”)
*815 I have here interpolated the common law cases in the text of the civil law. On examining them, it will be found that almost every word of the last quotation has been expressly sanctioned by the English courts.
V 4. When a payment made to a creditor to whom, several debts are due, exceeds the debt to which it ought to be applied, the overplus ought to be applied to the discharge of the debt which follows, according to the order explained in the preceding article, unless the debtor makes another choice.” This follows of course from principles before stated. ,
“'5. If a debtor makes a payment to discharge debts which, of their nature, bear interest, such as treat of a marriage portion, or what is due by virtue of a contract of sale, or that the same be due by a sentence of a court of justice, and "the payment be not sufficient to acquit both the principal and the interest due thereon, the payment will be applied in the first place to the discharge of the interest, and the overplus to the discharge of a part of the principal sum.
- “ 6. If in the cases of the foregoing article, the Creditor had given an acquittance in general for principal and interest, the payment would not be applied in an equal proportion to the discharge of a part of the principal and of .a part of the interest, but in the first place all the interest due would be cleared off, and the remainder would be applied to the discharge of the principal.”
The two last paragraphs contain a doctrine perfectly naturalized by all our cases, from Chase v. Box, (2 Freem. 261,) to State of Connecticut v. Jackson, (1 John. Ch. Rep. 17,) and vid. Stoughton v. Lynch, (2 id. 209.) Vid. also Hening’s ed. of Maxims in Law & Equity, App. 1 to Francis’ Maxims, pp. 106, 108, 113, and the cases there cited. Also Williams v. Houghtaling, (3 Cowen, 86 & 87, 8, 9, note (a) with the cases there cited.)
“7. When a debtor obliging himself to a creditor for several causes at one and the same time, gives him pawns or mortgages, which he engages for the security of all the debts, the money which is raised by the sale of the pawns and mortgages, will be applied in an equal proportion to the discharge of every one of the debts. (Perry v. Roberts, 2 Ch. Cas. 84, somewhat similar in principle.) But if the debts were contracted at divers times upon the security of the same pawns and mortgages, so as that the debtor had mortgaged for the last debts what should remain, of the pledge, after payment of the first, the moneys arising from the pledges would, in this case, be applied in the first place to the discharge of the debt' of the oldest standing. And both in the one and the other "case,- if any interest be due on account of the debt which -is to be discharged by the payment, the same will be paid before any part thereof be applied to the discharge of the principal.” This paragraph contains the familiar doctrine of priority of pledges: and
*816 follows-out the corollary of .applying .partial payment to discharge interest in .the.first place. The proposition that a payment on pawns, &c. for simulta- . -neons debts shall be distributed between the two debts, has never been exactly adjudged with us., though the ease interpolated is about the same 'in principle. And see what Holt, Ch. J. says in Styart v. Rowland, (2 Show. Rep. 216.)
The above is .the entire text of the corpus'juris civilis relative to the application or imputation of payments. 'The commentators on that law (among whom Pothier' is the best known and most popular with us) furnish various additional corollaries, several of which .have also been adopted by courts proceeding according to the course of the common law. The remark of Sir William -Jones, that the greatest portion of Pothier .on express and implied contracts is law at Westminster as at Orleans, (Jones on Bailm. 30,) justifies more strongly the parallel I have attempted in this note between the civil and common law. In this respect, Pothier has .done little more than .Domat. All he has added to -a translation of the civil law into French, are a.few very natural deductions rising almost mathematically from the text. (Vid. Poth. du Contr. pt. 3, ch. 1, art. .between whichr,and the common law, vid. a partial parallel, 1 Ev. Poth. 368 to 376, passim.)