June Term, 1860.

MOWRY
v.
WOOD.

---

## MOWRY VS. WOOD.

A debtor gave his note, to which was subjoined the following clause, "Having deposited with [the payee] school land certificates Nos. 112, &c., with authority to sell the same on the non-payment of this note, at either public or private sale, and apply the proceeds hereon without further notice." The note not being paid at maturity, the payee offered the certificates (which were assigned in blank) for sale at public auction, and the same were struck off and delivered to the highest bidder, for a small sum, which was credited by the payee upon the note, and the payee afterwards assigned the note to a third party, who recovered judgment thereon against the debtor, which remained unpaid. In an action brought by the debtor against the payee for a conversion of the certificates, it was *held*, that the deposit of the certificates under the agreement above recited, was not a pledge of personal property, but amounted to a mortgage upon the equitable estate of the debtor in the lands embraced in the certificates; that the only mode by which the creditor could enforce such mortgage, or extinguish the debtor's right of redemption, was by a suit in equity for that purpose; that the transfer of the note to such third party, carried with it the mortgage security, unless otherwise intended by the parties; that the (so called) sale of the certificates by the creditor, independently of, and without the transfer of any part of the debt, was nugatory, and such sale, and the delivery of the certificates to such bidder, did not make the creditor liable to the debtor as for the conversion of the certificates, the debtor's right of redemption not being impaired thereby, and it appearing that the creditor acted in good faith, and under an innocent misapprehension of the law as to his proper remedy.

The decision in *Ainsworth vs. Bowen*, 9 Wis., 343, was made upon the hypothesis, assumed by counsel of both parties, that school land certificates were a proper subject of pledge, and that a sale of the certificates by the pledgee was a sale of the pledgor's interest in the land, and so far as the decision seems to sanction that doctrine, it is overruled.

An assignment of a school land certificate in blank (*i.e.* where the name of the assignee is omitted), is not a transfer of the certificates at law.

Whether equitable mortgages may be created in this state, by the deposit of title deeds, strictly so called, *quaere*.

June Term, 1860.

MOWRY
v.
WOOD.

The nature of the estate created by school land certificates, with reference to descent, dower, lien of judgments, and liability to sale on execution, discussed *per* DIXON, C. J.

*It seems* that in trover for deeds or other evidences of title to land, where the *title* itself is unaffected by the conversion, and the deed or other instrument has been lost or destroyed through the defendant's mistake or slight negligence or omission, the proper measure of damages would be, such sum as would recompense the plaintiff for any actual loss he may have sustained, and for his trouble and expense in going into a court of equity or elsewhere, to establish and perpetuate the evidence of his title; but if it should appear that the taking or destruction was wanton or malicious, or that the defendant still possessed the deed, and stubbornly or vexatiously refused to surrender it, the jury might give such further damages, by way of punishment to the defendant, or in order to compel the return of such deed, as in their judgment the circumstances might require. *Per* DIXON, C. J.

A pledgor of personal property may waive the notice of sale to which, by law, he would otherwise be entitled.

If the agreement upon that subject is in writing, it is for the court and not the jury to determine whether notice is waived.

*It seems* that a waiver of notice of sale in such case, does not dispense with the necessity of a demand of payment, before a sale of the pledge.

ERROR to the Circuit Court for *Dane* County.

The complaint of *Wood*, the plaintiff below, alleged that on the first day of March, 1858, being indebted to the defendant, *Luke Mowry*, in the sum of $625, he executed to him a note therefor, payable in nine months from date, with interest at twelve per cent. per annum from its date until paid, and at the same time, as collateral security for the payment of the note, deposited with the defendant four school land certificates, embracing a quarter section of land in Iowa county in this state, and which were worth $2,000. The complaint further stated that the plaintiff had paid on said note the sum of $42; that the defendant had assigned the note to certain third parties, who had recovered judgment and issued execution thereon; that the plaintiff was ready and had offered to pay the amount of said judgment to the owners thereof, if they would surrender up to him said certificates, but they were unable to do so, having never had them in their possession; that he was ready and had offerred to pay the defendant the amount of said judgment if he would deliver up said certificates, and procure the satisfaction of said judgment, but that the defendant had refused

to do so, falsely pretending that he had made a sale of said certificates, whereas, in fact, he had wrongfully and fraudulently misapplied the same and converted them to his own use, to the damage of the plaintiff $2,000, &c.

The answer of the defendant admitted the execution of said note, and the deposit of said school land certificates as collateral security therefor, but alleged that at the time of pledging said certificates, the plaintiff gave the defendant authority to sell the same at public or private sale at any time after said note should become due, and to apply the proceeds of such sale to the payment thereof; that after the note became due the defendant frequently demanded payment thereof from the plaintiff, which being refused, he, on the first day of April, 1859, advertised said certificates for sale, by posting up in three conspicuous places in the city of Madison, written notices that said certificates would be sold at public auction, at a place in said notice designated, on the 11th day of April, 1859, at 2 o'clock P. M., of which the plaintiff had due notice; and that at the time and place so designated, the defendant, publicly, fairly, and without any intent to defraud the plaintiff, offered said certificates for sale, and sold the same to the highest bidder, one at a time, and endorsed the proceeds of such sale upon said note; and therefore he denied that he had wrongfully misapplied said certificates and converted the same to his own use. The answer also denied that the plaintiff had offered to pay the amount of said judgment to the holder thereof, or to the defendant, upon the surrender of said certificates, or upon any other condition, and denied that the certificates were worth $2,000, or any considerable part of that sum.

The plaintiff and defendant were both sworn as witnesses in their own behalf. The plaintiff testified that he never saw any notices of the sale of said certificates posted up, and never had any notice or intimation that they were about to be sold by the defendant, and that the land embraced in the certificates was worth from $12 to $15 per acre; that the amount due to the state on said land was about $3 per acre; that in June or July, 1859, he offered the defendant to pay him the note, when the defendant said he had sold it; that

he then demanded the note and securities, and said he was ready to pay the note, and has since secured the judgment rendered thereon. Several other witnesses on the part of the plaintiff, testified that the land embraced in the certificates was worth from seven to ten dollars per acre. To all this testimony as to the value of the land, the defendant objected, on the ground that the proof should be confined to the value of the certificates, and not that of the land; but the court overruled the objection, and the defendant excepted.

The defendant testified that after the note became due he frequently demanded payment thereof from the plaintiff; that on the 26th of March, 1859, he told the plaintiff that he should commence advertising the school land certificates for sale, and give ten days' notice thereof; that he accordingly, on the first day of April, 1859, advertised the same for sale as stated in his answer, and, at the time and place mentioned in the advertisements, sold said certificates at public auction, one at a time, and struck them off to Jason Mowry, who was the highest bidder, at twelve cents per acre, and endorsed the proceeds of said sale, being $20, upon said note; that after the sale of the certificates, the plaintiff told him "he was prepared to settle up," but made no tender of the money. The note was here offered in evidence, for the purpose of showing the authority to sell the certificates, and was as follows: "$625. Madison, March 1st, 1858. Nine months after date, for value received, I promise to pay to *Luke Mowry* or order, at the Dane County Bank, six hundred and twenty-five dollars, with interest at the rate of twelve per cent. per annum after due, until paid. Having deposited with him school land certificates, Nos. 112, 113, 114 and 115, with authority to sell the same on the non-payment of this note, at either private or public sale, and apply the proceeds hereon, without further notice, (of the 500,000 acre tract.) A. S. Wood."

Several witnesses were sworn on the part of the defendant, as to the value of school land certificates, and estimated their market value in Madison at the time of the sale by the defendant, variously, at from six to twenty cents per acre of the land embraced therein; some testifying that the qual-

ity of the land would make some difference in the market price of certificates, and others, that it would not.

The court charged the jury as follows:

"If the contract of bailment or pledge in this case provided that the sale of the pledge might be made without notice, then no notice of the sale was required; but the defendant in such case cannot sell the pledge without first making a demand for the payment of the note. This demand need not be made in any particular form of words; any words will make a demand which give the pledgor distinctly to understand that payment is unqualifiedly exacted at the time.

"If notice is not waived, then the defendant could not legally sell the certificates without giving a reasonable notice of the sale, so that the public may know of the time and place of the sale, and of the property to be sold, and the terms of sale; and also giving to the plaintiff, the pledgor, actual notice of such sale, and demanding the payment of the note. Whether such public notice was given in this case, and whether such notice was reasonable as to time, and whether such actual notice and demand were made, are questions to be determined by you. In case you find for the plaintiff, then he is entitled to recover the cash market value of the property at the time of its conversion by the defendant. In determining this value, you may take into consideration both the market value of the land represented by the certificates, and the market value of the certificates as such."

The defendant excepted to so much of said instructions as declared that the defendant could not sell the pledge without first making a demand for the payment of the note; and to so much as declared that if the jury found for the plaintiff he was entitled to recover the cash market value of the property at the time of its conversion, and that in determining that value the jury might take into consideration both the market value of the land embraced in the certificates, and the market value of the certificates as such.

The court also instructed the jury "that if the pledged property was purchased for the benefit of the defendant, and

in such a manner that he could control it as his own, it was optional with the plaintiff to repudiate the sale, and, on paying his indebtedness, to redeem the property;" to which instruction the defendant excepted.

The defendant asked the court to charge the jury as follows: 1. "That upon the non-payment of the note when due, the payee had a right to sell the pledged certificates upon a reasonable notice, and apply the proceeds of the sale to the payment of the note;" which instruction the court gave with the following qualification: "after demanding payment of the note." 2. "It was not necessary that *Mowry* should give *Wood* written notice of the sale. If he gave him notice otherwise, you have a right to take that into consideration, and decide whether it was reasonable notice, when taken together with the posted notices;" which instruction the court gave, with the following qualification: "but such notice must be actual notice to the plaintiff." 3. "*Mowry* had a special property in the certificates, and had a right to the possession of them until the note was paid, or a tender of the full amount due thereon was made to him by *Wood*, or some one in his behalf; and unless this special property had been terminated, the plaintiff cannot recover;" which instruction the court gave with the following qualification—"unless you find that the defendant had wrongfully converted the property to his own use;" to the refusal of the court to give which instructions in the terms asked for, and to the said qualifications attached thereto, the defendant excepted.

The defendant's counsel also requested the court to instruct the jury as follows: 4. "In the sale of the certificates, *Mowry* was to give a reasonable notice of the time and place, and to use no unfair means to deter persons from buying, and if he has done this, and applied the proceeds of the sale to the payment of the note, so far as the same would go, then the plaintiff cannot recover." 5. "It was necessary before bringing this suit, that *Wood* should make a tender of the amount due on the note, in money, unless waived by *Mowry*, and also demand a return of the certificates, and unless he has done this he cannot recover." 6. "If the jury

find that the note was made payable at a time certain, and at a particular place, then no demand of payment was neces- sary, before advertising the pledge;" which several instruc- tions the court refused to give, and the defendant excepted.

The jury found for the plaintiff "and that the defendant was guilty as charged in the complaint," and assessed the plaintiff's damages at $640. Motion for a new trial over- ruled, and judgment on the verdict.

*Nat. Rollins*, for plaintiff in error.

*Smith, Keyes & Gay*, and *Wakeley & Tenney*, for defendant in error.

*By the Court*, DIXON, C. J. If the school land certificates, and *Wood's* interest under them, could be regarded as per- sonal property, and the transaction as a pledge, still the judgment of the circuit court would have to be reversed. The judge left it to the jury to determine whether *Wood* had waived notice of the intended sale of the certificates. This was error. The agreement was in writing, signed by *Wood*, and its execution undisputed. There was no parol evidence on the subject, and whether there was a waiver de- pended upon the proper construction of the written agreement, which was a question of law for the court and not of fact for the jury. It is clearly competent for the pledgor of goods to waive the notice to which, by law, he is entitled. *Wilson vs. Little*, 2 Coms., 443; *Allen vs. Dykers*, 3 Hill, 593; *Dykers vs. Allen*, 7 id., 497. And if there be a special agreement regulating the mode of sale, it must be complied with. Edw. on Bailments, p. 260. The agreement in this case was clear and explicit. Notice was expressly waived. There was, therefore, upon that point, nothing to submit to the decision of the jury, and they should have been instructed, as matter of law, that no notice was required.

Viewed in the same light, the instructions in regard to the necessity of a demand for payment before the certificates could be lawfully sold, were probably correct. *Stearns vs. Marsh*, 4 Denio, 227, and cases there cited. A waiver of notice of sale is not a waiver of notice to redeem. *Wilson vs. Little, supra.*

But the fundamental error into which both court and counsel seem to have fallen on the trial below, arose from supposing that the certificates and *Wood's* interest in the land were personal property, and endeavoring to apply to the case those principles which would govern property of that kind under like circumstances. This mistake was common to the counsel of both parties, and may perhaps have been, in part, attributable to the decision of this court in the case of *Ainsworth vs. Bowen*, 9 Wis., 348. That was a similar case, and was tried at the circuit upon the theory that the certificates were the proper subjects of pledge; that a sale of them by the pledgee was a sale of the pledgor's interest in the land, and that, if the pledgee converted them, such conversion was, if the pledgor so elected, an extinguishment of that interest, for the value of which the pledgee was responsible in an action of trover, or on the case, or by way of counter-claim to an action by him against the pledgor to recover the original debt. It was argued here upon the same hypothesis, and although it now seems to me to have been improper, we decided it upon the assumption of counsel that the certificates were mere personalty and subject to pledge as such, at the same time suggesting our doubts and withholding any opinion upon the question.

In this case the controversy below was mainly as to the measure of damages. For the plaintiff it was insisted that it was the market value of the land represented by the certificates; for the defendant, that it was the market value of the certificates at Madison, the place where the agreement was entered into, and where the sale was made. The judge overruled the objections of the respective counsel, and admitted evidence as to both, and charged the jury that in determining the damage sustained by the plaintiff, they might take both into consideration. If the acts of *Mowry* amounted to a conversion or unlawful detention of the certificates, it seems to me that neither of these would be the true rule of damages. Both proceed upon the notion that a conversion of the certificates was a conversion of the land, or of the borrower's interest in it, and are graduated by the value of that interest. This, it appears to me, would be wrong,

June Term, 1860.

Mowry v. Wood.

especially in a case like this, where the alleged act of conversion proceeded from an innocent misapprehension of law on the part of the lender, as to his rights, and the course to be pursued by him to foreclose the borrower's equity of redemption. The certificates were not title, but merely the evidences of title. They might have been utterly lost or destroyed, and yet the title or ownership of the land have remained subject to the same conditions under which it was then held. Hence, the conversion of the certificates was not a conversion of the land, or of *Wood's* interest, for those were incapable of conversion. As mere contracts on paper, to the possession of which the owner was entitled, the certificates were the same as any other chattel, and it is in this light, I apprehend, that trover for title deeds is maintained. It would not seem to be the object of the action to restore to the owner the value of the land, for that he has not lost; but to compensate him for the injury and inconvenience which he has suffered in consequence of his being deprived of the possession of his paper evidences of title, and perhaps, in proper cases, to compel their restitution. For this purpose title deeds are regarded as mere chattels, and an action at law is given for injuries to the possession of them. In actions of the ordinary kind for the conversion of goods or choses in action, as bills or notes, the measure of damages is the value of the property and interest from the time of the conversion. But in such cases there is a substantial loss of property, and the recovery of the judgment and a satisfaction of it, operate as a transfer of the title. There are, therefore, very good reasons for the rule. But an action for title deeds presents a very different condition of things. The deeds are of no value to the defendant, and no case can be found, I think, where the recovery and satisfaction of a judgment, in an action for the conversion of them, have been adjudged to pass the legal title. Such a mode of transferring land would be most anomalous, and under our system of conveyance seems impossible. It is hard to conceive of an instance where the fee, or a less interest in land, could be thus transferred, unless it be in the case of a conversion of a

note, or bond and mortgage, or of the written evidence of an outstanding equity, by the holder of the legal title. In the case of a mortgage it might follow from the personal nature of the demand, it being regarded in law as a mere chose in action. In that of the legal owner, if he should convert an executory contract to convey, and the vendee should obtain satisfaction for his interest in an action of trover, it might merge or extinguish his equitable right. There may be other cases where the title may be lost or merged, but it seems to me that they cannot be very numerous. I should think, therefore, that in those cases where the title is unaffected, and the conduct of the defendant has not been fraudulent or oppressive, but where the deed or other written instrument was lost or destroyed through his mistake, negligence or slight omission, the more just rule of damages would be such sum as would recompense the plaintiff for any actual loss which he may have sustained, and for his trouble and expenses in going into a court of equity or elsewhere, to establish and perpetuate the evidence of his title, with the costs of the action. In case of an *actual* loss or destruction of a school land certificate, the legislature have provided an easy and cheap mode of replacing it. Upon satisfactory proof by affidavit, the commissioners are authorized to issue a certified copy of the original to the person entitled thereto, which shall have the same force as the original or duplicate. R. S., chap. 28, sec. 54. If the taking, loss or destruction, was wanton or malicious, the jury, might add such sum, by way of punishing the defendant, as in their judgment the circumstances required. *Dennis vs. Barber*, 6 S. & R., 420; *Berry vs. Vantries*, 12 id., 89; *Harger vs. M'Mains*, 4 Watts, 418; *Taylor vs. Morgan*, 3 id., 333. If it should appear that the defendant still possessed the deed or writing, and stubbornly or vexatiously refused to surrender or produce it, damages to the full value of the land, and even beyond, might be given, in order to compel a return, and as a penalty for the obstinacy and vexation.

Although it has long been settled that trover for title deeds may be maintained, yet upon looking into the books, it will be found that there is a most singular scarcity of au-

thorities upon the question of the amount of damages which the plaintiff is entitled to recover. Mr. Sedgwick, p. 490, cites most of the few cases bearing upon it, but says almost nothing upon the subject. *Towle vs. Lovet*, 6 Mass., 394, is the only reported case which I have been able to find, of an action brought by the owner of land, or his representative, against a stranger, for the conversion of a title deed, and there the sum for which judgment should be rendered against the defendant, if the court should be of opinion that the plaintiff, in her capacity of administratrix, was entitled to recover, was agreed upon by the parties, but what it was we are not informed. The action was by the administratrix for a conversion alleged to have been committed in the life time of the intestate, and the only question was whether she could maintain it. The court held that she could, and, among other reasons, said, "that the conversion was committed in the intestate's life time, and while he lived the damages for the conversion accrued to him, which, as a *chose in action*, came to the plaintiff as his administratrix, and did not descend to the heir." In *Clowes vs. Hawley*, 12 John., 483, trover by the assignee of a bond conditioned for the conveyance of a tract of land, was maintained against the obligor, and it appearing that the plaintiff had done every thing requisite on his part, to entitle him to a conveyance, it was held that he was entitled to recover the value of the land which was to be conveyed. The peculiar circumstances of the case justified the rule. The defendant held the legal title to the land, and payment of the judgment would extinguish the plaintiff's equitable interest. The defendant had wrongfully converted the bond, and it was not for him to dictate whether the plaintiff should sue directly upon it, proceed in equity for a specific performance, or elect to take the value of the land in the action which he had brought. In *Esdaile vs. Oxenham*, 3 Barn. & Cress., 225, the plaintiff, having contracted to purchase an estate, had the deeds of conveyance prepared at his own expense, and sent them to the vendors for execution. After being partially executed, the deeds accidentally fell into the hands of the defendant, an attorney, who had a demand against the vendors for business '

done in his profession. Some necessary parties having refused to execute them, the plaintiff abandoned the contract, and demanded the deeds from the defendant, who refused to surrender them, claiming that he had a lien for his demand against the vendors. In trover for the deeds and stamped pieces of parchment, it was held that the plaintiff was entitled to recover the deeds at all events, in a cancelled, if not in an uncancelled state, and a verdict in his favor was entered for one shilling damages, being the value of the parchment upon which the deeds were written. These, so far as I can learn, are the only reported cases which have any direct connection with the question, and it is apparent that they throw little or no light upon it. Mr. Tidd, speaking of the measure of damages in actions of trover, says: "So, in trover for title deeds of an estate, belonging to the plaintiff and of great value to him, though of little or no value to the defendant, if it should appear that the latter is in possession of them and will not deliver them up, the jury would probably be directed to give liberal damages;" but he cites no decisions. 2 Tidd's Pr., 885. And ALDERSON, B., in *Loosemore vs. Radford*, 9 Mecs. & Wel., 657, says: "The case resembles that of an action of trover for title deeds, where the jury may give the full value of the estate to which they belong, by way of damages, although *they are generally reduced to* 40s.' on the deeds being delivered up." From this it would appear that the action is resorted to in England principally for the purpose of compelling a return of the deeds, and when that object is accomplished, the damages are merely nominal. In this unsettled state of the law upon the question, I do not at all regret that we are enabled to dispose of this case without deciding it, and having given such impressions as an examination of it has produced upon my own mind, I leave it.

I have already said that the primary error was in regarding the transaction as a pledge, and in supposing that *Wood's* interest in the land and certificates could be extinguished or converted by a sale, as in the case of goods. Although the certificates, as contracts in writing, may, for some purposes, be regarded as chattels or choses' in action, yet it was evi-

dently not the intention of the parties to pledge them as such, but to pledge *Wood's* estate in the land represented by them, as a security for the payment of the debt. That estate was something tangible and of value, but the mere certificates were worthless in the hands of any one except the holder of the estate. If there is no distinction between contracts of that kind made with the state and those made by private individuals—and I can see no reason for any—then *Wood* was possessor of an equitable estate of inheritance in the land, subject, of course, to forfeiture for the non-fulfilment of the conditions of the agreements, but nevertheless, until forfeited, perfect and indefeasible. It was an interest in the fee, and a performance of the conditions would have been followed by the acquisition of it. In case of his death it would have descended to his heirs. R. S., chap. 92, §1. Accompanied by possession it was subject to the lien of judgments and to levy and sale on execution against him. *Jackson vs. Parker*, 9 Cow., 73. And it may be a question whether our statutes have not subjected such estates to the lien of judgments and made them liable to a sale upon execution under any circumstances. R. S., chap. 132, § 36; chap. 5, §§ 9, 13; chap. 134, § 8. It was the proper subject of mortgage in the ordinary form. *Bull vs. Sykes*, 7 Wis., 449. The state had parted with the possession of the land, and *Wood* could have maintained ejectment, or trespass for injuries done to it by a stranger. R. S., chap. 28, § 51. In many of the states the widow is entitled to dower in lands thus held by the husband at the time of his death, and it is not improbable that it is so here. *Rowton vs. Rowton*, 1 Hen. & Mun., 91; *Dean vs. Mitchell*, 4 J. J. Marsh., 451; *Stevens vs. Smith*, id., 64; *Hamilton vs. Hughes*, 6 id., 581; R. S., chap. 89, § 1. If the course prescribed by section 8 of article 10 of the constitution had been pursued, and a conveyance executed, and a mortgage taken to secure the unpaid purchase money, there could have been no question about it, and these executory contracts may be the same in effect. *Smith vs. Mariner*, 5 Wis., 551. And the widow would also, under section 5 of chapter 98, have been entitled to the interest or income of one-third part of the surplus, in

case of a sale by virtue of the mortgage, after the death of the husband. In *Button vs. Schroyer*, 5 Wis., 598, it was said by this court that the relation between the vendor and vendee, under an executory contract for the conveyance of real estate, possession having been taken and a part of the purchase money paid, and the title withheld as security for the remainder, was analagous to that of equitable mortgagor and mortgagee. It seems to me, particularly in the case of school and university lands, where the constitution has provided for a conveyance and mortgage back, that the relation between the purchaser and the state more nearly resembles that of legal mortgagor and mortgagee. The beneficial seisin and possession of the land is in the purchaser. The state is entitled to the money merely, and until payment in full or forfeiture, seems more in the attitude of a legal mortgagee, who holds the title to secure his debt. After payment and before conveyance, it would be the mere trustee or title holder for the purchaser's use.

From this cursory view of the nature of *Wood's* interest in the land, it becomes apparent that it was incapable of conversion by a mere wrongful transfer of the certificates, and that the transaction, if it amounted to anything, was an equitable mortgage created by the deposit of the certificates, and not a pledge. The object was to give a lien upon his estate to secure the payment of the debt. Whether equitable mortgages may be created in this state by the deposit of title deeds, strictly so called, need not here be considered. In some of the states it has been held that they cannot—that they are forbidden by the statute of frauds and inconsistent with the registry laws. *Bowers vs. Oyster*, 3 Penn. Rep., 239; *Van Meter vs. McFaddin*, 8 B. Monroe, 435. Whatever may be the merits, in opposition to the decisions of the English courts, of the objections founded upon the statute of frauds, those based on the registry laws seem to be supported by very strong reasons. Under their operation the possession of title deeds is no longer necessary to the assertion of rights to real estate. Office copies answer every purpose, and may be used on all occasions, with the same effect as the originals and without accounting for their absence. The possession

of them, therefore, has ceased to be of any practical importance to the owner. Purchasers seldom examine them, but are governed by an inspection of the records; and it is very rare that they are transferred on a sale of the estate. This change of the law and policy in respect to land titles having obviated the necessity out of which the doctrine of implied or equitable liens arose, they would seem incompatible with it and with the rights of third persons who may become interested in the estate.

But in the case we are considering, these difficulties do not exist. By virtue of the statute under which they are issued, these certificates become real muniments of title, as much and even more so than deeds were in former times. The mode of transfer prescribed by statute is an assignment in writing of the certificates, and not an independent conveyance of the holder's interest in the land. R. S., chap. 28, § 53. This implies that, upon sale, the certificates are to be delivered over to the vendee, accompanied by a proper assignment; and such, I believe, has been the common practice of the country. It is declared that the person to whom the same shall be legally assigned, shall have the same rights and remedies thereupon as the original purchaser would have had. It is this assignable quality of the certificates which, for the purposes of negotiation and sale, gives to them the character of a chose in action, as now defined by law; and although they may be acknowledged and recorded, yet no one would think of buying or selling them without delivery, any more readily than a note or bond for money, unless their absence were satisfactorily explained and accounted for. Possession of them is indispensable to a beneficial enjoyment of the estate, for without producing them a conveyance of the fee cannot be obtained. R. S., chap. 28, § 55. Hence possession is some evidence of right of property in the person in whose hands they may be, and they are not within the objections urged against the creation of equitable liens by the deposit of mere title deeds. As to the statute of frauds, if that could be insisted upon in a case like this, the evidence that the certificates were deposited as security for the payment of the debt, is in writing and subscribed by *Wood*.

It is contained in the note which was given for the money borrowed. I am of opinion, therefore, that the transaction was an equitable mortgage of *Wood's* estate in the land described in the certificates. It was equitable for two reasons: first, because the estate was equitable; and secondly, because the certificates were not so assigned as to transfer them at law. The first is manifest, and the second appears from its being averred in the complaint and admitted in the answer, that, at the time of the deposit, the certificates were assigned *in blank.* By this I understand that instruments, with proper words of assignment, were drawn and subscribed by *Wood,* but that the name of the assignee was omitted. This was clearly not a compliance with the statute, for to constitute an assignment in writing there must be an assignee who takes, as well as an assignor who gives, title at the time the assignment is made (*Galloway vs. Finley,* 12 Peters, 264), and both must be named in the instrument. It would be a palpable violation of the intention of the Legislature, and open the door to numberless frauds, if the estates of the holders could be transferred by a mere delivery of the certificates, which would be the effect of upholding an assignment in blank. It was given as a ready and inexpensive mode of conveyance, and the object in requiring it to be in writing was to secure certain and permanent evidence of the several transfers, with the names of the parties, in order that the title might be traced and frauds and mistakes detected and prevented.

Equitable mortgages, created by the deposit of title papers resembling these certificates, have been sustained in this country (*Williams vs. Stratton,* 10 Smedes & Marsh., 418; *Welsh vs. Usher,* 2 Hill's Ch'y Rep., 167); and even by the deposit of title deeds. *Rockwell vs. Hobby,* 2 Sandf. Ch'y Rep., 9.

It being determined that the transaction was an equitable mortgage, it follows that *Mowry's* proceedings to cut off *Wood's* equity of redemption by a sale of the certificates were utterly nugatory, and that after default his only remedy upon the securities was by a suit in equity for the establishment of his lien, and for a sale, in case *Wood* neglected to pay

the principal, interest and costs on a given day.  3 Powell on Mort., 1060, a.

The right to redeem remaining untouched, we are next to inquire how the conduct of *Mowry* in attempting to sell, and in delivering the certificates to a stranger, affected *Wood's* rights in other respects. Was it a wrong with respect to the certificates, as paper evidences of title, to the return of which he was entitled on payment of the debt, for which he can maintain an action at law? Did the sale and delivery operate as a release or extinguishment of *Luke Mowry's* equitable lien? And what interest, if any, did Jason Mowry acquire? Has he a lien for the twenty dollars which he paid upon the purchase? Had the same things happened in the case of a legal mortgage, I should have found little difficulty in answering these questions, and as the case is, I am inclined to think that it is to be governed by the same principles.

With regard to legal mortgages, it is an elementary principle that the mortgage is but an incident to the debt; that the transfer of the debt carries with it the mortgagee's interest in the security, and that a sale of the mortgage separate from the debt is a legal impossibility. In *Martin vs. Mowlin*, 2 Burr., 978, Lord MANSFIELD says: "A mortgage is a *charge* upon the land, and whatever would give the money will carry the estate in the land *along with it*, to every purpose. The estate in the land is the *same thing* as the money due upon it. It will be *liable to debts;* it will *go to executors;* it will pass by a will *not* made and executed with the solemnities required by *the statute of frauds*. The *assignment of the debt*, or *forgiving* it, will draw the *land* after it as a consequence; nay, it would do it though the debt were forgiven only by *parol;* for the right to the land would follow, notwithstanding the statute of frauds." The same learned judge, in the case of *The King vs. St. Michaels*, Doug., 630, says: "The mortgagee, notwithstanding the form, has but a chattel, and the mortgage is only a security. It is an affront to common sense to say the mortgagor is not the real owner."

In *Johnson vs. Hart*, 3 Johns. Cases, 322, and same case in 1 Johns. Rep., 580, where a debtor, as collateral security for

the payment of his own note, endorsed and delivered to his creditor the promissory note of a third party, secured by a mortgage to himself, which was also delivered, but without assignment, it was held that the transfer of the note carried with it the interest in the mortgage, notwithstanding it was stated in a receipt given by the creditor that the mortgage was "*not assigned.*" The assignment of a judgment for a debt carries the debt; and if the latter be secured by a mortgage, it carries the mortgage interest. So if the assignment be of only part of the judgment, and consequently a part of the mortgage debt, an interest in the mortgage passes corresponding to the proportion of the debt assigned. And if the assignment be by writing, under seal, without mention of the mortgage, it cannot be shown, by parol, that the assignor intended to reserve the mortgage. *Pattison vs. Hull*, 9 Cow., 747.

Before foreclosure or possession taken, lands mortgaged cannot be sold on execution against the mortgagee. *Glass vs. Ellison*, 9 N. H., 69; *Jackson vs. Willard*, 4 Johns. Rep., 41. In the last named case, KENT, C. J., says: Until foreclosure, or at least until possession taken, the mortgage remains in the light of a *chose in action*. It is but an incident attached to the debt, and, in reason and propriety, it cannot and ought not to be detached from its principal. The mortgage interest, as distinct from the debt, is not a fit subject of assignment. It has no determinate value. If it should be assigned, the assignee must hold the interest at the will and disposal of the creditor who holds the bond. *Accessorium non ducit sed sequitur principale.* It is difficult to conceive what right can be sold which does not convey the debt with it. The control over the mortgaged premises must essentially reside in him who holds the debt. It would be absurd in principle and oppressive in practice, for the debt and mortgage to be separated and placed in different and independent hands. There is no way to render a mortgage vendible but by allowing the debt to go with it: and this would be repugnant to all rule, for it is well understood that a *chose in action* is not the subject of sale on execution. When the mortgagee has taken possession of the land, the rents and profits may,

perhaps, then become the subject of computation and sale. Until then, the attempt would be useless."—"The assignment of the interest of the mortgagee in the land without an assignment of the debt, is considered in law a nullity." Opinion of the court in *Jackson vs. Bronson*, 19 Johns. Rep., 325. A deed or mortgage of land by a mortgagee, passes nothing to his grantee or mortgagee, unless it appears that the debt is also transferred. *Bell vs. Morse*, 6 N. H., 205; *Ellison vs. Daniels*, 11 id., 274; *Aymar vs. Bill*, 5 Johns. Ch'y Rep., 570. The latter was an action to foreclose a mortgage executed to *Aymar* by the defendants *Bill* and *Crane*, upon a house and lot in the fifth ward, and a house and lot in Vandewater street, in the city of New York; and was given to secure the purchase money of the house and lot in the fifth ward, which *Aymar* had sold and conveyed to those two defendants. The mortgage was duly registered the day after its date. The defendant *Bill* had previously mortgaged the lot in Vandewater street to the defendant *Crane* for $1000, which mortgage was also duly registered on the day of its execution. This mortgage *Crane* held at the time of executing the mortgage to the plaintiff, and afterwards assigned it to V. Fare, of whom the defendant F. was administratrix. She, by her answer, claimed preference over the plaintiff. The mortgage to the plaintiff, in terms, released *all* the "estate right, interest, claim and demand whatsoever" of the two mortgagors to both of the lots. It was determined by the court that "the interest of *Crane* as mortgagee of the lot in Vandewater street, was not at the time of the execution of the mortgage to the plaintiff, an interest in the land capable of being the subject of sale, either absolutely or by way of mortgage, *distinct* from the debt it was intended to secure", the mortgage not appearing to have been foreclosed, or possession taken by *Crane* under it.

A mortgagee, though he have conveyed the whole mortgaged premises, with warranty in fee, can yet foreclose, for this conveyance of the land will not pass his interest in the mortgage. So if he have thus conveyed only a part of the mortgaged premises, he may yet foreclose for the whole, un-

der a power of sale in the mortgage, and may himself become the purchaser. *Wilson vs. Troup*, 2 Cow., 195.

The assignment of the interest of the mortgagee in the land, without an assignment of the debt, is considered to be without meaning or use. 4 Kent's Comm., 194. An assignment of the mortgage, without an assignment of the debt, is treated, at most, as a transfer of a naked trust. 2 Story's Eq. Jur., § 1023, note 2.

The doctrine of the common law in regard to the rights of a legal mortgagee, is well summed up by the supreme court of New Hampshire in *Ellison vs. Daniels, supra*, where they observe that "so far as it may be necessary to enable the mortgagee to prevent waste, and to keep the land from being in any way diminished in value, or to receive the rents and profits, and, in short, to give him the full benefit of the security, and appropriate remedies for any violation of his rights, he is undoubtedly to be treated as the owner of the land. In all other respects, and for all other purposes, the interest of the mortgagee is treated as a mere personal chattel." The sale of the land mortgaged is not one of the purposes for which his interest may be regarded as real estate.

These principles, so familiar and well established as to legal mortgages, are, for the most part, equally applicable to equitable mortgages created by the deposit of title papers as security, the most material point of difference being that in mortgages of the latter description created by the *mere* act of deposit, the assignment of the debt does not draw after it the mortgage security. Such mortgages may be transferred, but it can only be done in the same way they are at first created, by a deposit of the title papers with the assignee of the debt. 3 Powell on Mort., 1059; 10 Smedes and Marsh., 426. This distinction is founded on the fact that in such cases there is no written contract defining the rights of the parties. The lien is implied from the mortgagee's possession of the title papers; and hence possession of them becomes an indispensable element in the proof of any one who would take the benefit of the lien as his assignee. In this case, however, the agreement was in writing, and upon it *Mowry* might have compelled a delivery as against *Wood*, or any person but a

*bona fide* holder for value. It is not, therefore, within the exception, but is in my judgment, in this respect also, like a legal mortgage.

Now if a legal mortgagee, who, for some purposes, is treated as having a legal estate in the land, cannot, by deed or assignment, transfer an interest therein independently of the debt, still less can it be done by an equitable mortgagee, who at law is regarded as having no right. If such a transfer by the former *be considered without meaning or use, or a nullity;* or if the transferee *must hold the interest at the will and disposal of the creditor who holds the debt,* or as the trustee of a *naked trust* having no beneficial interest, then the same must be equally true of a transfer by the latter in a case like the present. There is no room for distinction between the two cases, and hence I think that Jason Mowry took nothing by his purchase—not even a lien, as against *Wood,* for the twenty dollars that he paid, which *Luke Mowry* became liable instantly to refund.

It follows from the same premises that *Luke Mowry* did did not lose his lien upon the certificates for the security of his debt, and that it passed, upon his subsequent transfer of the note, to Wakeley & Tenney, unless the circumstances attending that transfer show that such was not the intention of the parties. It is true that it is competent for a mortgagee, if he desires, to separate the debt from the mortgage, in which case the mortgage is extinguished. 1 Johns. Rep., 591; 5 Cow., 206; 9 id., 753; 9 Wend., 84. It is also true that it was the intention of *Mowry,* at the time of the sale, to part with the certificates; but it was upon the supposition that he was availing himself of them as securities, in which he was entirely frustrated. He had no intention of parting with them upon any other terms, and as his action for that purpose was nugatory and void, it necessarily left him in the same condition as before. He was liable to refund the price, and for that reason, and because his lien still subsisted, he was entitled to the benefit of it.

Nor do I think that the sale was a wrong of which *Wood* can complain. As a depositary of the certificates, *Mowry* was responsible for ordinary neglect only, or for a violation

VOL XII—28

of good faith.   3 Powell on Mort., 1061, b.   It is not shown that he acted in bad faith.   It was lawful for him to transfer them, provided he, at the same time, transferred the note. The separation was the result of a mistake.   It did not impair *Wood's* rights, or complicate his remedies.   If he commenced an action to redeem, it was only necessary for him to make one additional party to have the proceeding successful, and compel a surrender of the certificates.   If he paid or tendered the sum due on the note to the holders of it, he had the same means of enforcing a return of the certificates from Jason Mowry, in case of his refusal, as he would have had from *Luke Mowry*, under like circumstances.   If the certificates had been negligently or wantonly destroyed, or placed beyond his reach, the question would have been very different.   As it is, I think he suffered no injury, for which he can maintain an action, and that the judgment of the circuit court should be reversed, and the action dismissed.

Ordered accordingly.