## COMMERCIAL BANK OF LYNCHBURG v. RUFE et al.

(Circuit Court, W. D. Virginia. March 16, 1899.)

1. EQUITABLE ASSIGNMENTS—PRIORITY.

After the recovery of a judgment by a debtor he executed an irrevocable power of attorney, authorizing the grantee to collect the judgment and apply the proceeds in payment of the grantor's indebtedness to plaintiff bank, in pursuance of a previous oral agreement which he had made with the bank's officers. Prior to the execution of the power, and pending the suit, he, being also indebted to defendant, wrote numerous letters to him, in which he expressed his willingness to transfer the claim on which judgment was recovered to him, but no transfer was ever made, and defendant thereafter sued the debtor, and attached the claim in suit, making no claim of assignment. Held, that the letters, in the absence of evidence that defendant assented and acted on them, did not constitute an equitable assignment of the claim, and that plaintiff was entitled to the fund.

2. SAME—AGREEMENT BETWEEN ATTORNEYS.

An agreement between attorneys for a debtor prosecuting a suit in his favor and the attorney for the debtor's creditor, that any recovery should be for the creditor's benefit, does not constitute an assignment of the recovery to such creditor as against a prior assignee of the recovery from the debtor, who had no knowledge thereof, and was not a party to the agreement.

3. SAME—EFFECT.

An irrevocable power of attorney authorizing the grantee to collect a judgment, and apply its proceeds to the payment of the debt of the holder, and stipulating that it shall in no wise affect the conduct of the suit by the grantor's attorneys, vests an interest in the creditor in the funds ultimately to be recovered from the judgment, which is not impaired by the vacation thereof in a subsequent suit, but which at once attaches to another judgment in the debtor's favor subsequently recovered on such claim.

Harrison & Long, for plaintiff.
F. S. Kirkpatrick and B. T. Crump, for defendants.

PAUL, District Judge. This is a controversy between the plaintiff and the defendant Rufe over the disposition of the sum of $4,000, unpaid balance of a judgment in favor of F. M. Threadgill against the United States Express Company. The record shows that in April, 1895, said F. M. Threadgill recovered in an action at law against the United States Express Company, in this court, at Lynchburg, a judgment for $54,371. It further shows that this judgment was, in a chancery suit brought by said United States Express Com-

pany against F. M. Threadgill, set aside and annulled, on the ground of misconduct of the jury which rendered the verdict in said action at law, on which said judgment was entered, and that a new trial was ordered in said action at law; that, after a jury had been impaneled in said new trial, and after considerable testimony had been taken, a compromise verdict was agreed upon by the parties, and a judgment entered thereon for the sum of $6,000 in favor of the plaintiff. Of this sum $2,000 was paid by said express company to the counsel of Threadgill in satisfaction of their fee in the case. It further appears that said Threadgill, at the time said judgment was entered on said consent verdict, was, and had been for several years, certainly as far back as February 9, 1893, indebted to the defendant Rufe in a large amount—about $30,000—for cigars purchased, the greater part of which had by Threadgill been shipped, through the United States Express Company, to numerous parties, in many localities in the United States, and which contract of shipment gave rise to the suit at law between Threadgill and the express company. At the time the compromise verdict was agreed upon and judgment entered thereon for $6,000, said Threadgill was indebted to the plaintiff, the Commercial Bank of Lynchburg, in the sum of $8,259. The evidence does not show when this indebtedness originated, but shows that April 1, 1895, the amount due the bank by Threadgill was $7,420. On the 22d day of January, 1897, said F. M. Threadgill executed, at the request of the attorney for the plaintiff, the following power of attorney:

"Know all men by these presents that the undersigned, F. M. Threadgill, hereby constitutes and appoints Charles M. Blackford his attorney in fact as well as in law, to collect from the United States Express Company the amount of a judgment in his favor obtained at the April term, 1895, of the circuit court of the United States for the Western district of Virginia, in a suit wherein he was plaintiff and Thos. C. Platt, etc., was defendant, and the amount of which judgment is $54,371, with interest from the 27th day of April, 1894. This power of attorney shall be irrevocable. It shall be the duty of the said Chas. M. Blackford, upon collecting the said judgment, or so much thereof as may be collectible, after paying the late firm of Kirkpatrick and Blackford their fee, as per written contract with said Threadgill under date January 8, 1896, to pay to the Commercial Bank of Lynchburg the sum of $8,259, with interest thereon from the 9th day of February, 1897, and also to pay to the said bank any sum which the said bank may at the time of such payment have paid out by way of premium on sundry policies of insurance upon the life of the said Threadgill, held by the said bank under an assignment made by him and wife to the said bank on the 18th day of May, 1896, with any interest that may have accrued thereon. But it is distinctly understood that this assignment shall in no wise control or affect the judgment of the said Kirkpatrick and Blackford in the management of the said cause, and they shall have the same power to compromise the same which they had before this assignment was made. Given under my hand and seal this 22d day of January, 1897. F. M. Threadgill. [Seal.]

"State of Virginia, City of Lynchburg, to wit: I, R. C. Blackford, a notary public in and for the city and state aforesaid, do certify that F. M. Threadgill, whose name is signed to the writing above, bearing date the 22d day of January, 1897, personally appeared before me in my city aforesaid, in the state of Virginia, and acknowledged the same to be his act. Given under my hand this 22d day of January, 1897. R. C. Blackford, Notary Public."

Both parties to this controversy assert they are assignees of Threadgill of so much of his claim against the United States Ex-

press Company as may be necessary for the satisfaction of their respective debts. There not being enough in the recovery of $6,000, after payment of attorney's fees, to satisfy both or either of the claims, the question to be determined on the evidence is, which has · an assignment covering the said sum of $4,000 in controversy, and, if both have assignments covering this fund, which has priority in point of time? The discussion of this question must be confined to the period anterior to and including the date of the power of attorney of January 22, 1897, executed by Threadgill in favor of the plaintiff. Some evidence has been taken, and considerable discussion had, as to what occurred in the court room between an attorney present in Rufe's interest and the counsel for Threadgill, at the time the compromise verdict was rendered, as to the terms of the compromise. Counsel for Rufe insists that it was understood between the attorney then present and representing Rufe and the attorneys for Threadgill that whatever was realized on the compromise after paying the attorney's fee should go to Rufe on his claim against Threadgill. Whatever this understanding was is of no importance in the decision of this cause, unless it were based on an agreement made before the execution of the power of attorney from Threadgill to Blackford. This requires an examination of the evidence on which the plaintiff and the defendant, respectively, base their contracts of assignment.

In addition to the power of attorney from Threadgill to Blackford, the plaintiff has taken the testimony of several witnesses to prove that several years before the execution of said power of attorney, Threadgill, by a verbal agreement, assigned to the plaintiff an interest in his claim against the express company for the payment of his debt due the bank, and that the execution of the power of attorney to Blackford on the 22d of January, 1897, was for the purpose of carrying into effect the previous verbal contract. On this point the court will quote from the depositions of several witnesses introduced by the plaintiff.

William A. O'Brien, a director of the bank, and for four or five years chairman of its finance committee, testifies:

"Q. 2. It appears from a paper writing executed by F. M. Threadgill, dated January 22, 1897, that he was indebted to the Commercial Bank, as of that date, in the sum of $8,259. Please state whether or not it comes within your knowledge that any agreement or contract was made between said Threadgill and the Commercial Bank prior to the 22d of January, 1897, under or by virtue of which the said bank acquired an interest in the claim which the said Threadgill was asserting against the United States Express Company, to the extent of his indebtedness to the bank. If so, state fully what it was, and the circumstances connected with it. A. I knew of his indebtedness all along, before Mr. Withers became cashier. He had borrowed a portion of that money from Mr. Jas. F. Kinnier, the former cashier (in fact, all of it was borrowed before Mr. Withers became cashier). During the litigation in that case, Mr. Kinnier, in consideration of Mr. Threadgill's agreeing to pay him all of that money, advanced more money, in order that he might carry on that suit against the express company. Q. 3. Did you or not, as the chairman of the finance committee of the bank, have any interviews with Mr. Threadgill in relation to that subject? If so, state how frequently, and what was said. My question now relates to the time prior to January 22, 1897. A. I could not say how many interviews. I had various conversations with him; half a dozen, possibly, or more; and he agreed in all these conversations that,

after the counsel were paid, we should have our money out of the money from the express company, and the paper that he signed was simply carrying out the contract that we already had with him, and it was so regarded."

Samuel T. Withers, who became cashier of the Commercial Bank in January, 1895, testifies:

"Q. 4. Please state whether it comes within your knowledge, as an official of the Commercial Bank, that prior to January 22, 1897, any agreement existed between F. M. Threadgill and the bank for the payment of Threadgill's indebtedness to the bank out of any recovery he might make on his claim against the United States Express Company, after the payment of fees to Threadgill's counsel. If so, state what it was, and the circumstances connected therewith. A. There was a distinct understanding with Mr. Threadgill, in regard to his indebtedness to the bank, that the bank should have an interest in any money recovered from the express company after his counsel's fees were paid; that we should have the first money after the counsel's fees were paid. I had repeated conversations with Mr. Threadgill on that point, and he assured me on his word as a Christian gentleman that nothing could prevent the bank from getting that money, if any part of it was recovered from the express company. I so stated these facts to the board, and Mr. Threadgill stated this proposition in the presence of a part of the finance committee,—Mr. O'Brien, the chairman of that committee,—that the bank's interest in any money should be to the full extent of the bank's debt against Mr. Threadgill. Q. 5. It appears that a paper writing was signed by Mr. Threadgill, dated the 22d January, 1897. Did you have any interviews with Mr. Threadgill in reference to his signing that paper, and, if so, in whose presence, and what was said? A. I had several interviews with Mr. Threadgill in regard to his signing this paper. He had repeatedly agreed to do it, carrying out his verbal contract with the bank, and this paper was signed, or rather read and agreed to, in the presence of Maj. Kirkpatrick and Mr. Sydnor Kirkpatrick, in their office. Threadgill and myself were present, and I think Mr. Edmunds was also present. During this conversation Maj. Kirkpatrick did everything he could to prevent Mr. Threadgill from signing this paper writing, urged him not to do it, and was very indignant when Mr. Threadgill announced in their presence that he had pledged his word as a Christian gentleman to carry out his verbal contract with the bank when called on to do so, and that, whether it ruined Mr. Rufe or himself, or the express company, or anybody else, he was going to carry out his pledge to the bank; and he did sign the paper in the adjoining office, before R. C. Blackford, a notary public, in my presence. * * * After I became cashier, Mr. Threadgill, I suppose at least fifty times, promised and pledged, and repeatedly did so, that he would give the bank an interest in this claim; he considered they had an interest in it; that they had helped him to carry on his business by not taking judgment, and helped him to carry on this suit, and he said that he appreciated this fully, and intended the bank not to lose a cent if he ever recovered anything from this express company, and said he would issue this paper to that effect, carrying out his verbal contract, whenever I called on him to do so; and before I severed my connection with the bank I called on him to do so."

James E. Edmunds, attorney for the plaintiff bank, and one of its directors, says:

"Q. 3. Please state whether you have any knowledge of a contract or agreement between F. M. Threadgill and the Commercial Bank, prior to January 22, 1897, in relation to securing a debt due by Threadgill to the Commercial Bank; and, if so, state what it was, and the circumstances connected with it. A. F. M. Threadgill was indebted to the Commercial Bank in a large sum of money, which fact was frequently discussed before our board of directors. Threadgill represented to the bank that it could not lose anything by him, because of all of his property it should have the first advantage; that he felt under the deepest obligations to the bank for the kindness which it had extended to him, and that the bank could have a deed to any or all of his property when it wished it. He stated that the bank had been carrying him for a long time,

which had enabled him to carry on his business, and his family to live, and for that reason his first obligation was to it."

To sustain the contention of the defendant Rufe that he is the assignee of Threadgill of an interest in the claim of the latter against the express company, which gives his debt priority over that of the plaintiff, and establishes his right to the fund of $4,000 in controversy, a number of letters from Threadgill and his counsel to Rufe are filed as evidence. The material and relevant parts of these letters are quoted in the brief of counsel for the defendant, and it is chiefly these extracts that are relied upon as constituting the contract of assignment between Threadgill and Rufe, and as establishing the fact that such assignment was prior to that from Threadgill to the plaintiff. The first of these extracts is from a letter of Threadgill to Rufe, February 9, 1893:

"My account against the two companies amounts to over $62,000. I have worked hard for the past five years, as you know, and I feel confident I will in time succeed; but I would to-day give it all for a receipt in full of what I owe you. No one can appreciate more than myself your kindness and confidence."

June 1, 1893, Threadgill wrote to Rufe:

"On account of my indebtedness to you, I have borne with them [the express companies], and tried to prevail on them to do, until patience has ceased to be a virtue. I have filed account against the U. S. Express Co. for $54,480.50 for goods now held by them."

March 21, 1894, Threadgill writes to Rufe:

"And I would be glad if you would come down, and understand matters fully. Your doing so would greatly relieve my mind, and, I trust, increase your faith in getting your money, with interest, by continued patience. But for the fact that I owe you, the suit would not trouble me near so much. I can't express to you my appreciation of your patience, and I trust you may never have cause to regret it."

May 12, 1894, one of the attorneys for Threadgill wrote to Rufe:

"From the beginning, Mr. Threadgill has informed us that whatever was recovered in these cases was for your benefit, and we feel that we may say with great certainty that it will be so applied. * * * As far as we know, Mr. Threadgill owes nothing in Lynchburg, and, we presume, owes nothing to any one but you; and we believe your debt will be paid even should we fail in recovering anything from these suits, which we deem impossible, as he is now industriously and successfully engaged in business, and all his energy is put out, in our judgment, solely for the purpose of paying your debt, which seems to prey upon him to an extent which is refreshingly honest."

July 4, 1894, Threadgill writes to Rufe, and it appears from this letter that Rufe had threatened to commence legal proceedings to enforce his claim, which letter, Threadgill writes to Rufe, is a surprise, and says:

"I believe that I will collect my money, though it may be one year or two, I can't say; but with it all I have tried to live right up to my agreement with you, and only wish it was so I could pay you in full. * * * I am willing to transfer claims against Express Co. to you, or do anything in my power to settle with you in full."

August 1, 1894, Threadgill writes to Rufe:

"And I will give you written order to my attorneys to pay over to you, on receipt of same, any and all money received from either of the Express Cos.

against which I now have suits pending, until sufficient amount has been paid you to pay all that I owe you."

The last letter from Threadgill to Rufe, on which counsel for the defendant rely as showing an assignment to Rufe, was written April 18, 1895. In this letter Threadgill says:

"It would not take long to come to terms. If they [referring to the express company] will pay your paper, and ten thousand dollars in addition to my indebtedness to you, I think now I would accept it. You have been so patient and kind, I feel that I would be willing to make any sacrifice in reason to pay you."

September 23, 1896, during the pendency of the chancery suit to set aside the judgment recovered by Threadgill April, 1895, against the United States Express Company, and pending the appeal from that judgment in the supreme court, Mr. Kirkpatrick, one of Threadgill's attorneys, wrote to Stevens & Stevens, attorneys for Rufe, as follows:

"So that, as matters now stand, Mr. Rufe, whose chief security rests upon the realization of Threadgill's claim, stands in danger of losing fully two-thirds of his claim, and the one-third that may certainly or reasonably be looked for will be postponed for a long time to come. Under these circumstances we think he should, by some means or other, secure a settlement by compromise between the express company and Threadgill."

The foregoing extracts from the letters of Threadgill and his attorneys to Rufe and his attorneys, it is contended by counsel for the defendant, establish an equitable assignment by Threadgill to Rufe of an interest in Threadgill's claim against the express company. It is further insisted that this assignment is prior in time to that of Threadgill to the plaintiff. If the propositions made in these letters from Threadgill to Rufe had been accepted by the latter, and acted upon by him, the contract of assignment would have been concluded. But the proposals of Threadgill to Rufe to transfer claims against the express companies, or to do anything in his power to settle with Rufe, and to give a written order on his attorneys to pay over to Rufe any and all money received from either of the express companies against which he had suits pending, until sufficient had been paid to Rufe to satisfy his claim against Threadgill. were not accepted. So far from either of these offers being accepted by Rufe, the evidence shows that he had, prior to the time of the compromise verdict rendered for $6,000, instituted attachment proceedings in the state of New York to recover his debt against Threadgill, and served process of attachment on the United States Express Company. Threadgill, in his answer filed in this cause, does not claim that there was a contract of assignment between himself and Rufe. He confines the agreement to assign to Rufe to what occurred at the trial in which the compromise verdict was rendered for $6,000. He asks that his agreement with Rufe's counsel that, after payment of fees of Threadgill's attorneys, the balance of the sum of $6,000 should go to Rufe in full satisfaction of Threadgill's indebtedness to Rufe, be enforced. The plaintiff was not a party to this agreement, and cannot be affected by the understanding between counsel for Threadgill and the attorney looking after the interest of Rufe. Rufe, in his answer to the bill, claims that the action of Threadgill against

the United States Express Company was for his use and benefit, and that this is shown by the written communications of Threadgill and his counsel. Extracts from these letters have been quoted. There is no evidence to sustain the claim that the action was for the benefit of Rufe. It is shown that counsel for Threadgill did not represent Rufe. The evidence fails to show that he contributed in any way to the costs of conducting the suit, by employing counsel or otherwise. Neither the deposition of Rufe nor that of Threadgill has been taken in the cause. If such contract of assignment as is now contended for was made between Threadgill and Rufe prior to the assignment to the plaintiff by the power of attorney of January 22, 1897, an effort, at least, it seems to the court, would have been made to establish it by the testimony of the parties to such agreement, both of whom are competent witnesses.

The court is asked to decide that a proposition by a debtor to his creditor to assign him a claim or an interest therein, asserted against a third party, constitutes an equitable assignment from the debtor to the creditor, without the assent or concurrence of the latter. This proposition cannot be sustained. No authority is cited in support of it, nor does the court think any can be found to uphold it. An assignment does not differ in its essential elements from any other contract. There must be persons competent to contract, a valuable consideration, a legal subject-matter, and mutual assent of the contracting parties. No contract is raised by a mere overture or offer to enter into an agreement not definitely and expressly assented to by both parties. Chit. Cont. (10th Ed.) 8. The doctrine is thus stated in 1 Poth. Obl. pt. 1, c. 1, § 1, art. 2:

"Now, as I cannot, by the mere act of my own mind, transfer to another a right in my goods without a concurrent intention on his part to accept them, neither can I, by my promise, confer a right against my person until the person to whom the promise is made has, by his acceptance of it, concurred in the intention of acquiring such right."

As we have seen, Rufe bases his claim of an equitable assignment from Threadgill on the extracts from the letters as quoted, while Threadgill bases it on the agreement of compromise made between Threadgill's counsel and the counsel for the express company, to which, it is claimed, Rufe, by his attorney, was a party. The mere statement of these distinct contentions shows the absence of any contract or agreement that can amount to an equitable assignment. It shows that Threadgill never, in his correspondence with Rufe, abandoned his control of his claim against the express company. Mr. Blackford (Threadgill's counsel) on September 21, 1897, wrote to Rufe's counsel:

"He [Threadgill] still seems unwilling to give any assignment which will give Mr. Rufe any priority should the claim be collected, or any part thereof."

In Christmas v. Russell, 14 Wall. 69, the supreme court says:

"An agreement to pay out of a particular fund, however clear in its terms, is not an equitable assignment. A covenant in the most solemn form has no greater effect. The phraseology employed is not material, provided the intent to transfer is manifested. Such an intent and its execution are indispensable. The assignor must not retain any control over the fund,—any au-

thority to collect, or any power of revocation. If he do, it is fatal to the claim of the assignee. The transfer must be of such a character that the fund holder can safely pay, and is compellable to do so, though forbidden by the assignor."

Clearly, Rufe was not invested by an equitable assignment with such an interest in the claim of Threadgill as would have enabled him in his own right to enforce payment of the same to himself by the express company, though the company had been forbidden to do so by Threadgill. It is not so claimed by counsel for Rufe.

A further defense asserted to the right of the plaintiff to a lien on the fund of $4,000 is that the power of attorney authorizes Blackford to collect and pay over to the Commercial Bank the sum of $8,259 out of a judgment for $54,371 recovered by Threadgill against the express company. It is claimed that this confers authority on Blackford to collect money out of a judgment, and that, when the judgment was set aside, there was nothing out of which the money could be collected; that it was not an assignment of the cause of action or right of action, or of the claim on which the judgment was based, but of a fund to be collected out of a judgment. The following provision of the power of attorney to Blackford is relied on to sustain this contention:

"But it is distinctly understood that this assignment shall in no wise control or affect the judgment of said Kirkpatrick and Blackford in the management of the said cause, and they shall have the same power to compromise the same which they had before this assignment was made."

The evidence shows that the judgment against the express company was then in jeopardy, and the necessity of a compromise was being discussed. There is nothing in the evidence to justify the court in saying that this provision in the contract authorized the counsel for Threadgill to defeat by a compromise the interest of the Commercial Bank in the fund represented by the judgment, and transfer that interest to Rufe. The power of attorney given to Blackford vested an interest in the plaintiff in the fund due from the express company to Threadgill, and is, by its terms, irrevocable.

In 2 Black, Judgm. § 947, it is said:

"Where a plaintiff in a judgment gives to a creditor an order on his attorney to pay him the money collected by the attorney on the judgment, which order the creditor delivers to the attorney, it creates an equitable assignment of, and lien on, the proceeds of the judgment, and the attorney holds the same in trust for the creditor, and such assignment cannot be revoked by the judgment plaintiff."

That this is an assignment of a part only of a judgment does not change the principle. Insurance Co. v. Glover, 9 Fed. 529. The position of counsel for Rufe that, when the judgment was set aside, there was nothing out of which the plaintiff could collect its money, or that could pass by the assignment, is not sustained by the authorities. The doctrine is stated as follows in 2 Black, Judgm. § 948:

"At common law the assignment of a judgment does not vest the legal title in the assignee. That remains in the judgment creditor, subject to the equitable rights of the assignee. But the cases generally agree that the assignment carries with it the debt or claim on which the judgment was based, and the right to stand in the creditor's place as regards the means of its col-

lection and enforcement, together with any incidental rights or advantages existing at the time, such as the benefit of an appeal bond. And the assignee's rights are not affected by the fact that the consideration was less than the face of the judgment."

In George v. Tate, 102 U. S. 564, the supreme court held that the assignment of a judgment carried with it the assignment of the bond on which the judgment was founded.

In Freem. Judgm. (Ed. 1886) § 431, the doctrine is thus stated:

"The assignment of a judgment which was void because in excess of the jurisdiction of the court has been held to transfer the debt for which the judgment was entered. And it seems that the assignment of a judgment necessarily carries with it the cause of action on which it was based, together with all the beneficial interest of the assignor in the judgment, and all its incidents."

The effect of the assignment of a judgment on the debt or claim on which it was based was considered in Pattison v. Hull, 9 Cow. 747. The court says:

"The assignment of a judgment necessarily carries the debt. Nor is it possible to separate them. The judgment would be barren. Nor can we conceive of its existence without the debt. I must, therefore, hold the debt to be directly assigned in this case; and all the effects must follow which the law attaches to an assignment of that character."

In Bolen v. Crosby, 49 N. Y. 183, the court thus states the doctrine:

"The assignment of the judgment carried with it the claim and debt upon which it was founded, and all claims against others as collateral and incident to it. By whatever terms the assignment was made, the debt, as the principal thing, passed, and with it all rights and remedies for its recovery and collection. The capacity of the plaintiff to sue, and his right to all the remedies which his assignor could have had, are perfect. The right to the debt as evidenced by the judgment against an insolvent corporation and the right to recover the same debt from the defendants upon their personal liability cannot exist in the hands of different persons. The assignment of the judgment necessarily carries the debt. They are inseparable."

In Bank v. Loomis (Iowa) 69 N. W. 444, a well-considered case, the court said:

"It is the general rule that the assignment of a judgment necessarily carries with it the cause of action on which it is based, together with all the beneficial interest of the assignor in the judgment, and all its incidents."

The court holds that there was no contract between Threadgill and Rufe of an equitable assignment of the whole or of a part of the claim of Threadgill against the express company prior to the 22d of January, 1897; that the power of attorney of that date from Threadgill to Blackford was an assignment from said Threadgill to the plaintiff of said Threadgill's claim against said express company for the sum of $8,259; and as the recovery of said Threadgill against the said express company, after deducting the fee of the attorneys of said Threadgill, was for the sum of $4,000, the plaintiff is entitled to that sum, being the amount in controversy. A decree will be entered accordingly.